

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-5-2008

# Khouzam v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 07-2926

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Khouzam v. Atty Gen USA" (2008). *2008 Decisions.* Paper 17.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/17

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 07-2926 & 08-1094
_____

SAMEH SAMI S. KHOUZAM,

Petitioner No. 07-2926

v.

ATTORNEY GENERAL OF THE UNITED STATES;
MICHAEL CHERTOFF, SECRETARY
OF DEPARTMENT OF HOMELAND SECURITY;
JULIE MYERS, ASSISTANT SECRETARY OF
HOMELAND SECURITY
_____

SAMEH SAMI S. KHOUZAM,

v.

MICHAEL CHERTOFF, Secretary of Department
of Homeland Security;
THOMAS H. HOGAN, Warden,

Appellants No. 08-1094

_____

_____

On Petition for Review of a Decision
of the Department of Homeland Security
A75-795-693

-and-

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil No. 07-cv-00992)
District Judge: Honorable Thomas I. Vanaskie

_____

Argued June 30, 2008

Before: RENDELL, SMITH, and FISHER, <u>Circuit Judges</u>

(Filed: December 5, 2008 )

_____

Lee Gelernt, Esq.   **[ARGUED]**
Judy Rabinovitz, Esq.
American Civil Liberties Union
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004-2400

2

Amrit Singh, Esq.   **[ARGUED]**
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004-0000

Morton H. Sklar, Esq.
World Organization for Human Rights, USA
2029 P Street, N.W.
Washington, DC   20036

Witold J. Walczak, Esq.
American Civil Liberties Union
313 Atwood Street
Pittsburgh, PA 15213-0000
*Counsel for Petitioner/Plaintiff-Appellee*
*Sameh Sami S. Khouzam*

Demetrios K. Stratis, Esq.
10-04 River Road
Fairlawn, NJ  07410-0000
*Counsel for Amicus Appellee*
*American Center for Law and Justice;*
*European Centre for Law and Justice*

Baher A. Azmy, Esq.
Seton Hall Law School
Center for Social Justice
833 McCarter Highway
Newark, NJ 07102-0000
Counsel for Amicus Appellee
Scholars of International Human Rights Law

Jane M. Ricci, Esq.
Eleanor H. Smith, Esq.
Zuckerman Spaeder
1800 M Street, N.W.
Suite 1000
Washington, DC 20036-0000
*Counsel for Amicus Appellee*
*Organisation Mondiale Contre la Torture*
*The Redress Trust*

Paul R. Taskier, Esq.
Dickstein Shapiro
1825 Eye Street, N.W.
Washington, DC 20006-0000
*Counsel for Amicus Appellee*
*Human Rights Watch;*
*Amnesty International;*
*Center for Constitutional Rights;*
*International Commission of Jurists;*
*International Federation for Human Rights*

Thomas H. Dupree, Jr., Esq.    **[ARGUED]**
United States Department of Justice
950 Pennsylvania Avenue, N.W.
601 D Street, N.W.
Washington, DC 20530-0000

*(continued)*

4

Douglas E. Ginsburg, Esq.
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044-0000
*Counsel for Defendants/Appellants*
*Secretary of Department of Homeland Security;*
*Thomas Hogan*

_____

OPINION OF THE COURT

_____

RENDELL, <u>Circuit Judge</u>.

Sameh Sami S. Khouzam, a citizen of Egypt and a Coptic Christian, challenges the legality of his detention and imminent removal based on diplomatic assurances by Egypt that he would not be tortured if he was returned. In 1998, Khouzam was denied admission to the United States and taken into custody upon arriving without proper documentation. After years of proceedings, Khouzam was granted relief from removal because it was more likely than not that he would be tortured if returned to Egypt. His removal was deferred, rather than withheld, because there were serious reasons to believe that he committed

5

a murder prior to departing Egypt. Khouzam was released from custody in 2006. In 2007, without notice or a hearing, the Department of Homeland Security ("DHS") again detained Khouzam, and prepared to remove him based on diplomatic assurances by Egypt that he would not be tortured. Khouzam filed an emergency habeas petition in the District Court for the Middle District of Pennsylvania, and a petition for review in this Court, arguing that the DHS's actions were unlawful. The District Court granted Khouzam's habeas petition after concluding, in a comprehensive, thoughtful opinion, that Khouzam was denied due process. The Government appeals that ruling.

The arguments before us may be summarized as follows: Khouzam argues that (1) the Government violated certain statutes and the Due Process Clause by failing to provide him a hearing to test the reliability of the diplomatic assurances; (2) diplomatic assurances from Egypt are categorically unreliable; and (3) the Government failed to comply with relevant regulations. The Government argues, in the alternative, that (1) federal courts lack jurisdiction to consider Khouzam's claims; (2) Khouzam's claims are non-justiciable; (3) Khouzam received all of the process to which he was entitled; and (4) the Government complied with all relevant regulations.

We will find for Khouzam for the reasons discussed at length below. We will reverse the District Court's order granting the habeas petition because we disagree with the

6

Court's conclusion that habeas relief was available. However, we will grant Khouzam's petition for review because we agree with the District Court that he was denied due process. We will accordingly remand the matter to the Board of Immigration Appeals ("BIA") for further proceedings consistent with this opinion.

## I.  Background

### A.  History of the Proceedings

This matter comes to us after proceedings that spanned a decade.  On February 10, 1998, Khouzam boarded a plane in Egypt bound for New York.  While Khouzam was in transit, Egyptian authorities notified the State Department that he allegedly committed a murder shortly before leaving the country.  U.S. officials accordingly cancelled Khouzam's visa, detained him upon arrival, and initiated removal proceedings because, with his visa cancelled, Khouzam lacked the requisite documentation.

The complex proceedings that followed may be summarized for present purposes.  Khouzam sought to avoid removal by applying for asylum, withholding of removal, and later for relief under the statutes and regulations implementing the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT").  *See* Sen. Treaty Doc. No. 100-20 (1988), 1465

U.N.T.S. 85. In proceedings ultimately concluding in a decision by the United States Court of Appeals for the Second Circuit in 2004, Khouzam was denied asylum and withholding of removal based on a determination that there were "serious reasons" to believe that Khouzam had committed a homicide before leaving Egypt. *Khouzam v. Ashcroft*, 361 F.3d 161, 166 (2d Cir. 2004).[1] However, the Court also determined that Khouzam was eligible for relief under CAT based on a finding by the Immigration Judge ("IJ") that there was "overwhelming" evidence that Khouzam would be subjected to torture in Egypt, and a subsequent determination by the BIA that:

> In light of the evidence that the Egyptian authorities routinely torture and abuse suspected criminals and the medical evidence indicating that [Khouzam] has scars and injuries which are consistent with past torture, . . . we agree with the Immigration Judge that [Khouzam] has established that it is more likely than not that he would be tortured if returned to Egypt.

---

[1] Neither asylum nor withholding of removal may be granted if "there are serious reasons to believe that the alien committed a serious nonpolitical crime outside the United States before the alien arrived in the United States." 8 U.S.C. § 1158(b)(2)(A)(iii); 8 U.S.C. § 1231(b)(3)(B)(iii). Only deferral of removal may be awarded to such an alien if there is a likelihood of torture. 8 C.F.R. § 1208.17(a).

*Id.* at 169, 171.[2] Because there were serious reasons to believe Khouzam committed a murder, however, his relief under CAT was limited to deferral of removal instead of the more permanent relief of withholding of removal.[3]

Khouzam subsequently challenged his continuing confinement through a petition for a writ of habeas corpus filed in the District of New Jersey, the jurisdiction where he was detained. On February 6, 2006, after Khouzam had been in custody for eight years, the Court granted the petition after concluding that "there was no significant likelihood of [Khouzam's] removal in the reasonably foreseeable future." (JA 190.) As a condition of release, Khouzam was required to report regularly to a Bureau of Immigration and Customs Enforcement ("ICE") facility in York, Pennsylvania, the city where Khouzam

---

[2]The Second Circuit vacated a 2002 decision of the BIA denying CAT relief upon finding that the BIA applied the wrong legal standard. In vacating the 2002 decision, the Court let stand a previous BIA decision of 2000 which affirmed that Khouzam was eligible for relief under CAT. *Khouzam v. Ashcroft*, 361 F.3d at 169, 171-72.

[3]"Deferral" differs from "withholding" of removal under CAT in that, in order to terminate withholding of removal, the Government must satisfy extensive requirements for reopening immigration proceedings. *See* 8 C.F.R. §§ 1003.2, 1003.23. These requirements do not apply when the Government seeks to terminate a deferral of removal. *See* 8 C.F.R. § 1208.17(d)(1).

intended to reside.

When Khouzam reported to the ICE facility on May 29, 2007, he was retaken into custody and informed that he was subject to imminent deportation. Khouzam's counsel received the following explanation in a letter of the same date from Julie L. Myers, the DHS Assistant Secretary for the ICE:

> Consistent with the procedures set forth at 8 C.F.R. §§ 1208.18(c) and 208.18(c), I have credited as sufficiently reliable the diplomatic assurances received by the Department of State from the Government of Egypt that your client, Mr. Khouzam, would not be tortured if removed there. The Secretary of Homeland Security has, therefore, in accordance with 8 C.F.R. §§ 1208.17(f) and 208.17(f), terminated Mr. Khouzam's deferral of removal to Egypt, effective January 24, 2007. The Department of Homeland Security will not remove Mr. Khouzam to Egypt prior to June 1, 2007.

(JA 52.) The Government provided no prior notice to Khouzam regarding the diplomatic assurances. Nor did the Government provide Khouzam any opportunity to review the assurances, or to present evidence or arguments challenging the assurances before an IJ, the BIA, or any other body.

10

On May 30, 2007, Khouzam filed an emergency petition for a writ of habeas corpus and a stay of his removal in the District Court for the Middle District of Pennsylvania. Khouzam argued, *inter alia*, that the Government's actions violated the prior order granting CAT relief and deprived him of his due process rights. Khouzam later added a claim that the Government failed to comply with the regulatory procedures for invoking diplomatic assurances. The District Court temporarily stayed Khouzam's removal on May 31, 2007. On June 22, 2007, Khouzam filed a motion to compel his release, arguing that his continued indefinite detention was not justified.

On June 26, 2007, Khouzam also filed a petition for review in this Court, challenging the termination of his deferral of removal on grounds similar to those argued in his habeas petition. We issued an order on December 12, 2007, explaining that we would delay consideration of Khouzam's petition for review until after the District Court ruled on the habeas petition. We also explained that the cases would be consolidated if either party appealed the habeas ruling.

On January 10, 2008, the District Court granted Khouzam's habeas petition. *Khouzam v. Hogan*, 529 F. Supp. 2d 543, 571 (M.D. Pa. 2008). As a threshold matter, the Court determined that it had jurisdiction over the habeas petition notwithstanding certain statutory provisions that could be construed to restrict the availability of this relief. The Court then determined that the DHS violated the Due Process Clause

11

of the Fifth Amendment by failing to afford Khouzam notice and an opportunity to be heard on the sufficiency of Egypt's diplomatic assurances. *Id.* at 570. The Court vacated the termination and ordered Khouzam to be released, once again because there was no significant likelihood that he would be removed in the reasonably foreseeable future. *Id.* On January 14, 2008, both the District Court and this Court denied motions by the Government to stay Khouzam's release.

We now have consolidated before us the Government's appeal from the District Court's grant of Khouzam's habeas petition, and Khouzam's petition for review of the DHS's decision to terminate his deferral of removal.

## B. Relevant Provisions Implementing CAT

At the heart of this case lie certain statutory and regulatory provisions implementing CAT in the United States, a treaty which was ratified by the Senate in 1990. S. Exec. Rep. No. 101-30, at 29-31 (1990). Article 3 of CAT provides, without exception, that "[n]o State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." Sen. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85.[4] On October 21, 1998, President

---

[4] The Senate ratified CAT subject to certain reservations,
(continued...)

Clinton signed into law the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. 105-277, div. G, § 2242, 112 Stat. 2681, 2681-822 (codified as note to 8 U.S.C. § 1231), which was enacted by Congress to give Article 3 of CAT "wholesale effect" domestically. *See Medellin v. Texas*, 128 S. Ct. 1346, 1365 (2008).

FARRA establishes that,

It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States.

---

[4](...continued)
understandings, and declarations. One of the declarations was that Articles 1 through 16 of CAT are non-self-executing, and one of the understandings was that the Article 3 phrase "where there are substantial grounds for believing that [the alien] would be in danger of being subjected to torture" would be construed by the United States to mean "it is more likely than not that [the alien] will be tortured." S. Exec. Rep. No. 101-30, at 30-31 (1990).

FARRA § 2242(a). Congress accordingly required "the heads of the appropriate agencies" to prescribe implementing regulations. *Id.* § 2242(b). Congress also directed that, "[t]o the maximum extent consistent with the obligations of the United States under the Convention" the regulations "shall exclude from the protection of such regulations aliens described in section 241(b)(3)(B) of the [INA]." *Id.* § 2242(c). This group of aliens includes any alien for whom "there are serious reasons to believe that [he or she] committed a serious nonpolitical crime outside the United States before [he or she] arrived in the United States." INA § 241(b)(3)(B)(iii); 8 U.S.C. § 1231(b)(3)(B)(iii).[5]

FARRA further provides that "[n]otwithstanding any other provision of law, and except as provided" in the implementing regulations themselves, "no court shall have

---

[5]INA § 241(b)(3)(B) also includes (1) any alien who "ordered, incited, assisted, or otherwise participated in the persecution of an individual because of the individual's race, religion, nationality, membership in a particular social group, or political opinion;" (2) any alien who "having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States," and (3) any alien for whom "there are reasonable grounds to believe that [he or she] is a danger to the security of the United States." INA § 241(b)(3)(B)(i), (ii), (iv); 8 U.S.C. § 1231(b)(3)(B)(i), (ii), (iv).

14

jurisdiction to review the regulations adopted to implement" the provisions of section 2242. FARRA § 2242(d). Congress also directed that "nothing in [§ 2242] shall be construed as providing any court jurisdiction to consider or review claims raised under the [CAT or § 2242], or any other determination made with respect to the application of the policy [stated in § 2242(a)], except as part of the review of a final order of removal pursuant to section 242 of the [INA]." *Id.*

The Department of Justice ("DOJ") accordingly promulgated regulations that established procedures for raising a CAT claim. Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478 (Feb. 19, 1999). Under these regulations an alien is entitled to protection from removal if the alien can prove "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2)-(3).[6]

Section 1208.18(c) establishes procedures for the use of diplomatic assurances, and reads in full:

> Diplomatic assurances against torture obtained by the Secretary of State.

---

[6]The regulations implementing FARRA are also codified at 8 C.F.R. pt. 208. For example, 8 C.F.R. § 1208.16 has an identical counterpart at 8 C.F.R. § 208.16.

15

(1) The Secretary of State may forward to the Attorney General assurances that the Secretary has obtained from the government of a specific country that an alien would not be tortured there if the alien were removed to that country.

(2) If the Secretary of State forwards assurances described in paragraph (c)(1) of this section to the Attorney General for consideration by the Attorney General or her delegates under this paragraph, the Attorney General shall determine, in consultation with the Secretary of State, whether the assurances are sufficiently reliable to allow the alien's removal to that country consistent with Article 3 of the Convention Against Torture. The Attorney General's authority under this paragraph may be exercised by the Deputy Attorney General or by the Commissioner, Immigration and Naturalization Service,[7] but may not be further delegated.

---

[7]The Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (2002), eliminated the Immigration and Naturalization Service ("INS") and assigned INS's enforcement functions to the DHS's Bureau of Immigration and Customs Enforcement ("ICE"). *See Kanivets v. Gonzales,* 424 F.3d 330, 333 n.1 (3d Cir. 2005). The DHS Assistant Secretary for the

(continued...)

(3) Once assurances are provided under paragraph (c)(2) of this section, the alien's claim for protection under the Convention Against Torture shall not be considered further by an immigration judge, the Board of Immigration Appeals, or an asylum officer.

*Id.* § 1208.18(c). Section 1208.18 provides no limitations on when diplomatic assurances may be invoked, either in terms of particular categories of aliens, or the status of an alien's CAT claims in the adjudicatory process. It stands apart as a separate process that may be followed by the Government with respect to aliens with either ongoing or completed CAT proceedings.

Deferral of removal under CAT is governed by 8 C.F.R. § 1208.17. Section 1208.17(a) establishes that aliens meeting the burden of proof for CAT relief, but ineligible for withholding of removal based on section 1208.16(d)(2), shall instead be granted deferral of removal. 8 C.F.R. § 1208.17. This includes an alien ineligible for withholding of removal based on a finding that "there are serious reasons to believe that [the alien] committed a serious nonpolitical crime outside the United States before [the alien] arrived in the United States." INA § 241(b)(3)(B)(iii).

---

[7](...continued)
ICE is the functional equivalent of the Commissioner of the now-defunct INS. *See* 8 C.F.R. §§ 1.1(d), 1001.1(d).

17

Section 1208.17(d) sets forth procedures for terminating a deferral of removal: "At any time while deferral of removal is in effect, the [Government] may file a motion with the Immigration Court . . . to schedule a hearing [before an IJ] to consider whether deferral of removal should be terminated," and the Government's motion should be granted as long as it is "accompanied by evidence that is relevant to the possibility that the alien would be tortured in the country to which removal has been deferred and that was not presented at the previous hearing." 8 C.F.R. § 1208.17(d)(1). The regulation provides for notice to the alien, an opportunity for the alien to be heard and to present evidence at the termination hearing, and a right to appeal to the BIA. The burden remains on the alien to prove that it is more likely than not that he or she would be tortured if returned to the proposed country of removal. *Id.* §§ 1208.17(d)(2)-(4).

Of particular importance here, section 1208.17(f) provides for termination on the basis of diplomatic assurances, and reads in full:

> Termination pursuant to § 1208.18(c) [diplomatic assurances]. At any time while deferral of removal is in effect, the Attorney General may determine whether deferral should be terminated based on diplomatic assurances forwarded by the Secretary of State pursuant to the procedures in § 1208.18(c).

18

*Id.* § 1208.17(f).  Neither this paragraph, nor any provision in FARRA or the implementing CAT regulations, sets forth any procedures to be afforded the alien once the Attorney General makes a determination that a deferral should be terminated based on diplomatic assurances.

## II.  Jurisdiction

### A.  Habeas Jurisdiction

Khouzam's habeas petition to the District Court challenged the DHS's decision to terminate his deferral of removal on statutory and constitutional grounds.  The Government argued there, as it does here, that Congress removed habeas jurisdiction from the Court through, *inter alia*, the REAL ID Act of 2005.  The District Court concluded that it had jurisdiction under the general habeas authority of 28 U.S.C. § 2241, after determining that a contrary interpretation would cause Suspension Clause problems. *Khouzam v. Hogan*, 529 F. Supp. 2d 543, 561 (M.D. Pa. 2008) (citing *Khouzam v. Hogan*, 497 F. Supp. 2d 615, 623 (M.D. Pa. 2007)).  However, we agree with the Government that Congress spoke with sufficient clarity in the REAL ID Act to remove habeas jurisdiction over this matter. While this would ordinarily present a Suspension Clause problem, we do not reach the issue because, as discussed below, this Court has alternative jurisdiction to consider Khouzam's arguments through his petition for review.

19

We review *de novo* the District Court's interpretation of the statutes applicable to Khouzam's habeas petition. *Gerbier v. Holmes*, 280 F.3d 297, 302 (3d Cir. 2002). The Supreme Court established in *INS v. St. Cyr,* 533 U.S. 289 (2001), that there is a "longstanding rule requiring a clear statement of congressional intent to repeal habeas jurisdiction." *Id.* at 298. In *St. Cyr*, the Supreme Court refused to interpret certain provisions of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") so as to foreclose any judicial review of an order of removal. *Id.* at 311. The Court concluded that the IIRIRA provisions did not eliminate habeas jurisdiction because, despite expressly precluding "judicial review" and "jurisdiction to review," none of them explicitly mentioned "habeas corpus" or 28 U.S.C. § 2241. *Id.* at 314. The "lack of a clear, unambiguous, and express statement of congressional intent to preclude judicial consideration on habeas," combined with the absence of an alternate judicial forum, was fatal to the Government's jurisdictional argument. *Id.*

The Government argues here that the REAL ID Act of 2005 clearly and expressly removes habeas jurisdiction. *See* REAL ID Act of 2005, Pub. L. 109-13, div. B, § 106(a)(1)(B), 119 Stat. 231, 310 (codified at 8 U.S.C. § 1252(a)(4)). The Act provides in relevant part:

> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241

20

of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of any cause or claim under [CAT] . . . .

8 U.S.C. § 1252(a)(4). The Government further contends that, because Khouzam's challenge to the DHS's termination of his deferral of removal is a "cause or claim under [CAT]," the District Court had no jurisdiction to consider it. The District Court, seeking to avoid constitutional questions, determined that the jurisdiction-stripping provision did not apply because Khouzam was challenging a termination decision by the DHS, rather than an order for removal that could be subject to a petition for review. *Khouzam v. Hogan*, 497 F. Supp. 2d at 623.

We disagree with the District Court's conclusion. In the REAL ID Act, Congress provided precisely what had been lacking in the statutory provisions at issue in *St. Cyr* — a clear statement within the legislation itself explicitly depriving the judiciary of habeas jurisdiction. IIRIRA made no reference to "habeas corpus" or section 2241, while 8 U.S.C § 1252(a)(4) refers specifically to both. Moreover, the House Conference Report accompanying the REAL ID Act indicates that section 106 was crafted using *St. Cyr* as a roadmap. *See* H.R. Rep. No. 109-72, at 173-75 (2005) (Conf. Rep.). This is helpful, and consideration of it is, we believe, permissible in light of

21

*Boumediene v. Bush*, 128 S. Ct. 2229 (2008). There, the Supreme Court deemed it appropriate for a court of appeals to consider legislative history indicating that habeas-stripping provisions of the Military Commissions Act ("MCA") were crafted to foreclose an avenue for review the Court had previously relied on in *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006). *Id.* at 2243. The Court in *Boumediene* reasoned that the MCA must be interpreted to deprive habeas jurisdiction if the "ongoing dialogue between and among the branches of Government is to be respected." *Id.* at 2243-44. We likewise conclude that 8 U.S.C. § 1252(a)(4) comports with *St. Cyr*, and precludes the District Court from exercising jurisdiction over Khouzam's habeas petition.[8]

Khouzam's habeas petition challenges the Government's termination of his deferral of removal based on diplomatic assurances. The Government prompted Khouzam's petition by invoking its diplomatic assurance authority under the CAT regulations. We find that litigation over the Government's use of this CAT authority is appropriately deemed to fall within the

---

[8]As discussed below, we also reach a different conclusion than the District Court by concluding that the DHS's decision to terminate Khouzam's deferral was a final order of removal, and thus subject to our jurisdiction through Khouzam's petition for review.

22

broad ambit of "any cause or claim under [CAT]."[9]  We therefore conclude that the habeas-stripping provision of section 1252(a)(4) applies to Khouzam's petition.

Because, as discussed below, Khouzam's petition for review affords an alternative avenue for review, we need not consider whether the provision violates the Suspension Clause. *See* U.S. Const. Article I, section 9 ("The privilege of the writ of habeas corpus shall not be suspended, unless when in cases of rebellion or invasion the public safety may require it.") Accordingly, we conclude that the District Court lacked jurisdiction to entertain Khouzam's habeas petition, and will vacate its order.

---

[9]As we discuss in Note 13 *infra*, we reach a different conclusion with regard to 8 C.F.R. § 1208(c)(3), which requires an IJ, the BIA, or an asylum officer to cease considering an "*alien's* claim for protection under [CAT]" once the Government proffers diplomatic assurances. (emphasis added). By challenging the Government's use of diplomatic assurances, an alien is not asserting his or her own claim for protection under CAT, but is instead rebutting the use of a removal tool by the Government.  While we conclude that Khouzam's habeas petition falls within "any cause or claim under [CAT]," and thus within 8 U.S.C. § 1252(a)(4), we also conclude that a challenge to diplomatic assurances falls outside the narrower scope of an "alien's claim for protection" under 8 C.F.R. § 1208(c)(3).

23

**B. Jurisdiction Over Khouzam's Petition for Review**

The Government argues that the DHS's decision to terminate Khouzam's deferral of removal is not a final order of removal, and thus this Court has no jurisdiction to consider that decision through Khouzam's petition for review. Alternatively, the Government argues that the petition for review, even if permissible, should have been filed in the Court of Appeals for the D.C. Circuit. Khouzam contends that 8 U.S.C. § 1252 should be interpreted to provide jurisdiction over his petition for review due to the serious constitutional questions that would otherwise arise. As the Supreme Court noted in *St. Cyr*, we must avoid construing a statute in a manner that "would raise serious constitutional problems," if an alternative interpretation that would avoid such problems is "fairly possible." 533 U.S. at 300 (citations and internal quotations omitted). Furthermore, Khouzam contends that forum selection is non-jurisdictional and this Court should exercise its discretion to retain the case. We agree with Khouzam. We conclude that 8 U.S.C. § 1252 can, and accordingly must, be fairly interpreted to provide jurisdiction over his petition for review. Furthermore, we agree that forum selection here is a matter of venue, and that it is appropriate for us to retain the case under the circumstances.

The Supreme Court has firmly established that a statute denying an alien the ability to test the legality of the alien's detention through a habeas petition is subject to constitutional scrutiny, and, upon failing such scrutiny, may be invalidated as

24

an unconstitutional suspension of the writ. *See Boumediene*, 128 S. Ct. at 2262, 2274. The Supreme Court further instructs us that the Suspension Clause is not implicated so long as Congress provides an "adequate and effective" alternative to habeas review. *Swain v. Pressley*, 430 U.S. 372, 381 (1977); *accord Boumediene*, 128 S. Ct. at 2262; *St. Cyr*, 533 U.S. at 314 n.38. Without question, serious constitutional questions would be raised if Khouzam were afforded no alternative to the habeas review denied by 8 U.S.C. § 1252(a)(4).

We have held that "there is no question" that a petition for review with a court of appeals, under the current statutory regime, provides an alien an adequate substitute to habeas review. *Kolkevich v. Att'y Gen.*, 501 F.3d 323, 332 (3d Cir. 2007). Other courts of appeal have reached the same conclusion. *See, e.g.*, *Singh v. Mukasey*, 533 F.3d 1103, 1106-08 (9th Cir. 2008); *Ruiz-Martinez v. Mukasey*, 516 F.3d 102, 114 (2d Cir. 2008); *Mohamed v. Gonzales*, 477 F.3d 522, 526 (8th Cir. 2007); *Alexandre v. U.S. Att'y Gen.*, 452 F.3d 1204, 1206 (11th Cir. 2006). Therefore, so long as it is "fairly possible" for us to conclude that we have jurisdiction over Khouzam's petition for review, we will do so to avoid the serious constitutional questions that would be raised if Khouzam lacked any judicial forum in which to challenge his removal.

We find no tension between this interpretive approach and the legislative history of the habeas-stripping provision. The House Conference Report that accompanied the REAL ID

25

Act plainly states that the Act "does not eliminate judicial review." H.R. Rep. No. 109-72, at 174. Rather, "the overall effect of the proposed reforms is to give every alien a fair opportunity to obtain judicial review while restoring order and common sense to the judicial review process." *Id.* at 175. The Report indicates that Congress was fully aware of the constitutional pitfalls of stripping habeas jurisdiction, and sought to avoid them entirely in crafting the provision codified in 8 U.S.C. § 1252(a)(4):

> [S]ection 106 would give every alien one day in the court of appeals, satisfying constitutional concerns. The Supreme Court has held that in supplanting the writ of habeas corpus with an alternative scheme, Congress need only provide a scheme which is an "adequate and effective" substitute for habeas corpus. *See Swain v. Pressley*, 430 U.S. 372, 381 (1977). Indeed, in St. Cyr itself, the Supreme Court recognized that "Congress could, without raising any constitutional questions, provide *an adequate substitute through the courts of appeals*." *St. Cyr*, 533 U.S. at 314 n.38 (emphasis added). By placing all review in the courts of appeals, [the REAL ID Act] would provide an "adequate and effective" alternative to habeas corpus.

*Id.*  Since section 1252(a)(4) provides that a petition for review under section 1252 is the exclusive alternative to habeas review, our task is to determine whether we have jurisdiction to entertain Khouzam's petition under that authority.

We have previously held that section 1252 only confers jurisdiction on us to review "final orders of removal." *Obale v. Att'y Gen.*, 453 F.3d 151, 158 & n.6 (3d Cir. 2006) (synthesizing the relevant subsections of 8 U.S.C. § 1252); *see* 8 U.S.C. §§ 1252(a)(1), (b).  We must therefore decide whether it is fairly possible for us to determine that the DHS's decision to terminate Kouzam's deferral of removal is a final order of removal.  This inquiry requires us to consider first whether the decision was an order of removal, and, if so, whether that order was final.

Congress did not provide a definition for an "order of removal."  Congress did, however, supply a definition for "order of deportation."  *See* 8 U.S.C. 1101(a)(47)(A).  In other contexts, this circuit and others have used the terms "deportation" and "deportable" interchangeably with the terms "removal" and "removable."  *See Kolkevich*, 501 F.3d at 326 n.2; *Obale*, 453 F.3d at 160; *Viracha v. Mukasey*, 518 F.3d 511, 513-14 (2d Cir. 2008); *Lolong v. Gonzales*, 484 F.3d 1173, 1177 n.2 (9th Cir. 2007); *Sosa-Valenzuela v. Gonzales*, 483 F.3d 1140, 1144 n.5 (10th Cir. 2007).  By substituting the respective terms into the statutory definition of an "order of deportation," we have previously deemed an "order of removal" to be an "order

27

. . . concluding that the alien is [removable] or ordering [removal]." 8 U.S.C. § 1101(a)(47); *Obale*, 452 F.3d at 160.

Seeing no reason to reconsider this approach here, we apply the definition to the DHS's decision. On February 24, 2004, the United States Court of Appeals for the Second Circuit issued a ruling by which Khouzam was granted deferral of removal. With that deferral in effect, the Government had no authority to remove Khouzam to Egypt. The DHS subsequently informed Khouzam on May 29, 2007 that, on the basis of diplomatic assurances from Egypt, it decided to terminate the deferral of removal and that Khouzam was accordingly subject to imminent removal. Moreover, a declaration by the ICE dated May 30, 2007, indicates that the ICE "arrested and detained Mr. Khouzam on May 29, 2007, in preparation for enforcing Mr. Khouzam's final order of removal." (JA 283.) Thus, the decision of the DHS to terminate Khouzam's deferral of removal made him eligible for, and apparently subject to, imminent removal to Egypt. We therefore conclude that the DHS's decision was an "order of removal" under section 1252.

The Government asserts that the BIA's order of March 7, 2002 denying Khouzam's applications for asylum and withholding of removal is an order of removal that will remain in effect regardless of any ruling on deferral. While this observation may well be correct, it has no bearing on whether the DHS's termination of deferral may also qualify as an order of removal. We find nothing to suggest that an alien may be

28

subject to only one order of removal at a time. Furthermore, we see no reason why a termination of CAT relief should be treated any differently for jurisdictional purposes from an initial denial of CAT relief, which we regularly review as an order of removal. *See, e.g.*, *Pierre v. Att'y Gen.*, 528 F.3d 180 (3d Cir. 2008) (en banc). Our reasoning is in accord with the Second Circuit's recent ruling in *Ali v. Mukasey*, 529 F.3d 478 (2d Cir. 2008), where the court vacated a termination of deferral of removal without raising any distinction between the denial of CAT relief and the termination of deferral as to CAT relief. *Id.* at 488.

The Government also contends that Khouzam challenged his March 7, 2002 order of removal before the Second Circuit and, under *Bonhometre v. Gonzales*, 414 F.3d 442 (3d Cir. 2005), aliens are limited "to one bite of the apple with regard to challenging an order of removal." *Id.* at 446. The problem with this argument is that the DHS handed Khouzam a new apple when it decided to terminate his deferral of removal. The DHS decision at issue here is a new order for removal that has never been the subject of a petition for review.

Having determined that the DHS's decision was an order of removal, we next consider whether it is fairly possible to conclude that the order was "final." Congress provided no statutory definition to establish when an order for removal becomes "final." Here, the substitution of "removal" for "deportation" into existing statutory definitions is less helpful.

29

Congress provided that an order for "deportation"

> shall become final upon the earlier of-

> (i) a determination by the [BIA] affirming such order; or

> (ii) the expiration of the period in which the alien is permitted to seek review of such order by the [BIA].

8 U.S.C. § 1101(a)(47)(B). The BIA never ruled on the DHS decision, nor was Khouzam afforded any opportunity to raise the matter before any adjudicative body. Indeed, this is a central concern raised by Khouzam in his substantive arguments.

While we found the deportation definition to be helpful above, it does not restrict us. First, even if "removal" were identical in meaning to "deportation" under the statute, the definition does not expressly exclude other triggers for finality. Moreover, it appears that Congress did not intend an order of deportation to be wholly synonymous with an order of removal, but rather that orders for deportation are a *subset* of orders for removal. For instance, section 309(d)(2) of the IIRIRA provides that "[f]or purposes of carrying out the [INA] . . . any reference in law to an order for removal shall be deemed to *include* a reference to an order of exclusion and deportation or an order of deportation." Pub. L. 104-208, 110 Stat. 3009 (1996) (emphasis

30

added).  Thus, the definition for finality of deportation orders does not control our analysis of the finality of an order of removal.[10]

Lacking a statutory definition, we can nonetheless easily determine that the DHS's order of removal was "final" through a common sense application of the term's plain meaning.  The Government itself claims that Khouzam was subject to imminent removal once the DHS decided to terminate the deferral of removal.  Thus, the Government argues that the DHS's termination decision was final under the relevant statutory scheme.  Moreover, we again note that the ICE itself stated that it "arrested and detained Mr. Khouzam . . . in preparation for enforcing Mr. Khouzam's final order of removal."  (JA 283.) Clearly, Khouzam was going to be removed, and that was final. We therefore conclude that the DHS's decision to terminate Khouzam's deferral of removal was effectively a final order of removal, and thus subject to our review under section 1252.

---

[10]Neither is our analysis controlled by the regulatory definition of finality for "[a]n order of removal made by [an] immigration judge" provided in 8 C.F.R. § 1241.1.  This definition is inapplicable because no IJ passed on the order for removal at issue in the instant case.  Nothing in this regulation establishes that an immigration judge must be the *exclusive* source for an order of removal.

The Government argues that, even if the DHS decision could be raised in a petition for review, we lack jurisdiction because a "petition for review shall be filed with the court of appeals for the judicial circuit in which the immigration judge completed the proceedings." 8 U.S.C. § 1252(b)(2). The Government notes that no IJ conducted any proceedings in our judicial circuit. In fact, as Khouzam argues, no IJ in any circuit even participated in the decision to terminate removal. However, section 1252(b)(2) is a non-jurisdictional venue provision. *Bonhometre*, 414 F.3d at 446 (citing *Nwaokolo v. INS*, 314 F.3d 303, 306 n.2 (7th Cir. 2002)). In *Bonhometre*, we exercised jurisdiction over petitions for review despite the fact that proceedings occurred within the First Circuit's jurisdiction. *Id.* We explained that, "given that this case has been thoroughly briefed and argued before us, and given that [the alien] has waited a long time for the resolution of his claims, we believe it would be a manifest injustice to now transfer this case to another court for duplicative proceedings." *Id.* For the reasons stated in *Bonhometre*, and the possible lack of any alternative forum, we retain Khouzam's petition for review.

### III. Justiciability

Next, the Government contends that the lawfulness of the DHS's termination of Khouzam's deferral of removal based on diplomatic assurances is a non-justiciable issue. The Government contends that we must refrain from deciding the matter under the political question doctrine and the rule of

32

non-inquiry.  For the reasons discussed below, we reject the Government's arguments.

## A.  Political Question Doctrine

The Government urges that we must refrain from exercising jurisdiction under the political question doctrine, predominantly because of the Executive's unique role in foreign relations.  We disagree.  According to the Supreme Court, "[t]he political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986).  Recognizing the potential for the overzealous application of this doctrine, the Court has admonished us to remain cognizant of the fact that the concern is with "'political *questions*,' not . . . 'political *cases*.'" *Baker v. Carr*, 369 U.S. 186, 217 (1962) (emphasis added); *see also id.* at 210-11 ("Much confusion results from the capacity of the 'political question label to obscure the need for case-by-case inquiry."); *Harbury v. Hayden*, 522 F.3d 413, 418 (D.C. Cir. 2008) ("[T]he doctrine is notorious for its imprecision, and the Supreme Court has relied on it only occasionally.").

Accordingly, the fact that the resolution of the merits of a case would have "significant political overtones does not automatically invoke the political question doctrine." *INS v. Chadha*, 462 U.S. 919, 942-43 (1983); *accord Japan Whaling*, 478 U.S. at 230. Although the Executive and Legislative Branches bear primary responsibility for the conduct of foreign affairs, "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker*, 369 U.S. at 211; *accord Japan Whaling*, 478 U.S. at 230. Thus,"a predicted negative impact on foreign relations does not, by itself, render a case nonjusticiable under the political question doctrine." *Gross v. German Found. Indus. Initiative*, 456 F.3d 363, 377 (3d Cir. 2006).

The Supreme Court in *Baker* identified six independently sufficient factors for determining whether a case involves a nonjusticiable political question:

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; [2] or a lack of judicially discoverable and manageable standards for resolving it; [3] or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; [4] or the impossibility of a court's undertaking independent resolution without

34

expressing lack of the respect due coordinate branches of government; [5] or an unusual need for unquestioning adherence to a political decision already made; [6] or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. at 217. A factor must not only be present, but must also be "inextricable from the case at bar." *Baker*, 369 U.S. at 217. Thus, our analysis must turn not on "semantic cataloguing" but, rather, on a "discriminating inquiry into the precise facts and posture of the particular case." *Id.*

We apply *Baker* with particular caution when asked to abstain in cases where individual liberty hangs in the balance. *See, e.g.*, *Kadic v. Karadzic*, 70 F.3d 232, 249 (2d Cir. 1995) ("[J]udges should not reflexively invoke [the political question doctrine] to avoid difficult and somewhat sensitive decisions in the context of human rights."); *United States v. Decker*, 600 F.2d 733, 738 (9th Cir. 1979) ("We are less inclined to withhold review [based on the political question doctrine] when individual liberty, rather than economic interest, is implicated"). This is because "[w]hatever power the United States Constitution envisions for the Executive in its exchanges with other nations . . . , it most assuredly envisions a role for all three branches when individual liberties are at stake." *Hamdi v.*

*Rumsfeld*, 542 U.S. 507, 536 (2004) (plurality opinion).[11]

The first *Baker* factor asks whether there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department." *Baker*, 369 U.S. at 217. The Government maintains that there is such a commitment here due to the broad constitutional authority of the Executive Branch over foreign affairs and, relatedly, over immigration. But the mere fact that foreign affairs may be affected by a judicial decision does not implicate abstention. *See, e.g.*, *Japan Whaling*, 478 U.S. at 229-30 (exercising jurisdiction over a claim that the Secretary of Commerce violated a federal statute in declining to initiate sanctions against Japan for exceeding treaty-based whaling quotas); *Haig v. Agee*, 453 U.S. 280, 282, 292-310 (1981) (exercising jurisdiction over the question of whether the Executive had authority to revoke a passport where the holder's activities abroad allegedly threatened national security and foreign policy); *INS v. Aguirre-Aguirre*, 526 U.S. 415, 423-32 (1999) (exercising jurisdiction over a challenge to a determination by the BIA that a crime committed by an alien was "non-political" in nature under the INA). The Government does not identify, nor do we find, any basis to conclude that the

---

[11]We note that the Supreme Court reached the merits in every case cited by the Government except for *Chicago & Southern Air Lines v. Waterman S.S. Corp. Civil Aeronautics Board*, 333 U.S. 103 (1948), a case that predated *Baker* and did not implicate individual liberty.

Constitution commits to the Executive the authority to determine whether the removal of a particular alien comports with immigration statutes and regulations. Accordingly, the first *Baker* factor is not implicated.

The second factor asks whether there is "a lack of judicially discoverable and manageable standards for resolving" any of the issues in the case. *Baker*, at 217. As we explained in *Gross*, "[e]ven where significant foreign policy concerns are implicated, a case does not present a political question under this factor so long as it involves normal principles of interpretation of the constitutional provisions at issue, normal principles of statutory construction, or normal principles of treaty or executive agreement construction." 456 F.3d at 388 (citations and internal quotation marks omitted). We see no reason not to include normal principles of regulatory construction in this list.

We accordingly look to Khouzam's substantive claims to assess whether any of them cannot be resolved through judicially discoverable and manageable standards. First, Khouzam maintains that returning him to Egypt could never comport with the CAT protections of FARRA, regardless of any diplomatic assurances. Second, he contends that terminating his deferral of removal based on diplomatic assurances, without notice and a hearing, violated the Due Process Clause of the Fifth Amendment. Finally, Khouzam asserts that the Government failed to follow the regulatory procedures pertaining to diplomatic assurances. These three claims are

37

fundamentally matters of statutory, constitutional, and regulatory interpretation respectively, and are accordingly legal, rather than political, standards. *See Gross*, 456 F.3d at 389.

The Government argues that there are no judicially manageable standards for the Judiciary to "competently assess the nature of the relationship between Egypt and the United States to determine whether this country can trust Egypt's diplomatic commitment." (Govt's Br. 29.) Khouzam's second and third arguments directly implicate due process and regulatory standards, and do not place the reliability of Egypt's assurances before us. To the extent that the reliability of assurances may be raised by Khouzam's FARRA argument, we do not find the second *Baker* factor to be implicated. As the Government concedes, a variety of considerations could inform whether particular assurances are sufficient to allow the United States to return an alien without violating FARRA. These include whether the terms of the assurances would satisfy FARRA; whether the assurances were given in good faith; the country's record of torture; the country's record of complying with previous assurances; whether there will be a mechanism to verify compliance with the assurances; the identity and position of the official relaying the assurances; and the incentives and capacity of the country to comply with the assurances. While some of these considerations may lack judicially discoverable and manageable standards, that is certainly not the case for all of them.

38

The third factor requires us to determine whether it would be impossible for a court to decide the case "without an initial policy determination of a kind clearly for nonjudicial discretion." *Baker*, 369 U.S. at 217. The Government contends that it would be impossible to do so here because "[t]he United States made a policy determination to approach Egypt to obtain its commitment with respect to Khouzam's treatment." (Govt's Br. 35.) This observation is beside the point. The Government's decision to seek diplomatic assurances is not at issue, but rather whether the Government complied with constitutional, statutory, and regulatory constraints in employing diplomatic assurances to remove Mr. Khouzam. Thus, the third *Baker* factor is not implicated.

The fourth *Baker* factor asks whether it would be impossible for a court to "undertak[e] independent resolution [of the matter] without expressing lack of the respect due coordinate branches of government." *Baker*, 369 at 217. The Government argues: (1) in section 2242(c) of FARRA, Congress directed the Executive Branch to enact regulations that exclude the aliens described in section 241(b)(3)(B) of INA — serious criminals, persecutors, and national security risks — from protection from removal to the maximum extent possible under CAT; (2) pursuant to this mandate, the Executive established a process that is "carefully crafted and narrowly tailored to deal with the most dangerous aliens," allowing for the termination of previously granted CAT relief based on diplomatic assurances; and (3) therefore, "[j]udicial jettisoning of this process would

39

show a lack of respect to the political branches." (Govt's Br. 36.)

This argument is flawed for at least three reasons. First, the regulations do not expressly limit the use of diplomatic assurances to situations involving section 241(b)(3)(B) aliens. *See* 8 C.F.R. § 1208.18(c). Second, we find nothing in the regulations that expressly excludes the judiciary from participating in the termination of CAT relief on the basis of diplomatic assurances. Finally, although a judicial finding that the Executive violated a constitutional, statutory, or regulatory provision "might in some sense be said to entail a 'lack of respect' for [the Executive's] judgment . . . [,] disrespect, in the sense the Government uses the term, cannot be sufficient to create a political question." *United States v. Munoz-Flores*, 495 U.S. 385, 390 (1990). Otherwise, every challenge to the legality of Executive action would be non-justiciable. In *Powell v. McCormack,* 395 U.S. 486 (1969), the Supreme Court cautioned:

> Our system of government requires that federal courts on occasion interpret the Constitution in a manner at variance with the construction given the document by another branch. The alleged conflict that such an adjudication may cause cannot justify the courts' avoiding their constitutional responsibility.

40

*Id.* at 549. We find that the same holds true with respect to statutes and regulations. Accordingly, we conclude that the fourth *Baker* factor does not pose a barrier to our exercise of jurisdiction.

Under the fifth *Baker* factor, a political question is present where there is "an unusual need for unquestioning adherence to a political decision already made." *Baker*, 369 U.S. at 217. The Government maintains that this is the case here because "the highest level of the Executive Branch decided to credit confidential diplomatic communications from a sovereign involving such a dangerous alien." (Govt's Br. at 36.) However, even if the decision to credit Egypt's assurances could be classified as a political decision, the Government has not identified any unusual need for unquestioning adherence to that decision. As we explained in *Gross*, "*Baker* makes clear [that] the fifth factor contemplates cases of an 'emergency[] nature' that require 'finality in the political determination,' such as the cessation of armed conflict." 456 F.3d at 390 (quoting *Baker*, 369 U.S. at 213) (second alteration in *Gross*). We see no comparable urgent need for finality here.

Finally, the sixth *Baker* factor asks whether exercising jurisdiction would present "the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Baker*, 369 U.S. at 217. The Government argues that such embarrassment would result if a court were to block Khouzam's removal contrary to a promise made by the

41

Executive to Egypt. The Supreme Court rejected a virtually identical argument in *Japan Whaling*. 478 U.S. at 229-30. There, conservation groups argued that certain statutes required the Secretary of Commerce to "certify" Japan for harvesting whales in violation of an international convention, where certification would have triggered automatic sanctions. *Id.* at 223, 226. After negotiations with Japan, the Secretary agreed not to certify Japan in return for a promise to meet certain harvesting limits in the future. *Id.* at 227-28. The Court considered the merits of the case, notwithstanding an argument that there was a risk of "multifarious pronouncements" under *Baker*. *Id.* at 229-30. The Court concluded that "one of the Judiciary's characteristic roles is to interpret statutes, and we cannot shirk this responsibility merely because our decision may have significant political overtones." *Id.* at 230. If the sixth *Baker* factor was not implicated in *Japan Whaling*, we do not see how it could be implicated here. This conclusion makes practical sense since the Executive could otherwise foreclose judicial review in various matters merely by making promises to other nations.

Therefore, with none of the six *Baker* factors present, the political question doctrine does not preclude us from exercising jurisdiction.

42

## B. The Rule of Non-Inquiry

The Government also argues that this case is non-justiciable under the so-called "rule of non-inquiry." When it applies, this doctrine bars courts from evaluating the fairness and humaneness of another country's criminal justice system, requiring deference to the Executive Branch on such matters. *See Hoxha v. Levi*, 465 F.3d 554, 563 (3d Cir. 2006). However, it has traditionally been applied only in the extradition context. *See, e.g.*, *Mironescu v. Costner*, 480 F.3d 664, 668-70 (4th Cir. 2007); *Prasoprat v. Benov*, 421 F.3d 1009, 1016 (9th Cir. 2005); *Hoxha*, 465 F.3d at 563; *United States v. Kin-Hong*, 110 F.3d 103, 111 (1st Cir. 1997); *In re Smyth*, 61 F.3d 711, 714 (9th Cir. 1995); *In re Howard*, 996 F.2d 1320, 1329 & n.6 (1st Cir. 1993); *In re Manzi*, 888 F.2d 204, 206 (1st Cir. 1989). In fact, we routinely evaluate the justice systems of other nations in adjudicating petitions for review of removal orders. *See, e.g.*, *Pierre,* 528 F.3d at 186-90; *Auguste v. Ridge*, 395 F.3d 123, 129, 152-54 (3d Cir. 2005); *Chang v. INS*, 119 F.3d 1055, 1060-68 (3d Cir. 1997). The Second Circuit did as much in 2004 when it found that Khouzam was likely to be arrested and tortured if removed to Egypt. *Khouzam v. Ashcroft*, 361 F.3d at 171. Furthermore, we have expressly reserved the possibility that, even in the extradition context, the rule of non-inquiry would not apply if an alien raises a CAT claim. *Hoxha*, 465 F.3d at 564-65. The Fourth Circuit has held that it does not. *Mironescu*, 480 F.3d at 670-73.

43

Without referring to the doctrine by name, the Supreme Court arguably extended the rule of non-inquiry beyond the extradition context in *Munaf v. Geren*, 128 S. Ct. 2207 (2008). However, *Munaf* involved the unusual circumstance of two American citizens being held by U.S. forces in Iraq, pursuant to security agreements with the Iraqi government, for allegedly violating Iraqi law. *Id.* at 2213-15. The Supreme Court found that, although habeas jurisdiction did lie, it was inappropriate to exercise that jurisdiction. *Id.* at 2213. The Court refused to consider whether the petitioners would face torture if turned over to Iraqi authorities, explaining that such an inquiry would "undermine the Government's ability to speak with one voice." *Id.* at 2226. However, the Court also noted that the petitioners had not properly raised a claim for relief under CAT, and expressed no opinion as to the result had the petitioners done so. *Id.* at 2226 & n.6. Given the highly unusual factual scenario presented, and that the Court expressly distinguished claims under CAT, we find that *Munaf* does not control here. We therefore conclude that the rule of non-inquiry is inapplicable to the present matter and does not bar the exercise of our jurisdiction over Khouzam's petition for review.

## IV. Legality of the DHS's Termination of Khouzam's Deferral of Removal

### A. Categorical Insufficiency

Khouzam argues that no diplomatic assurance from

44

Egypt could ever be sufficient to allow the Government to return him there under FARRA. First, he contends that returning an alien to any country that, like Egypt, has a record of consistently engaging in torture, would be a per se violation of FARRA. Second, Khouzam contends that, even if we were to find that an egregious human rights record is not dispositive, additional considerations in this case make any diplomatic assurances inherently insufficient to permit removal to Egypt. In particular, Khouzam asserts that Egypt failed to comply with prior assurances, that certain systemic barriers preclude post-return monitoring, that Khouzam had previously been tortured, and that he is at particular risk as a Coptic Christian.

We construe Khouzam's argument as an argument that the regulations must be interpreted under FARRA to preclude individualized determinations in his fact pattern. This argument must fail. Congress left it to responsible agencies to implement the obligations of the United States under CAT. FARRA § 2242(b). Khouzam offers no argument that the regulations prescribed by the DOJ were improperly promulgated or are being arbitrarily enforced. We must accept an agency's efforts to fill in statutory gaps left by Congress unless we find them unreasonable. *See Nat'l Cable & Telecomm. Assocs. v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005) (citing *Chevron U.S.A. v. National Resources Defense Council, Inc.*, 467 U.S. 837, 843-44 & n.11 (1984)). We do not find it unreasonable for the DOJ to create a procedure for making an individualized determination, in every case, as to whether particular diplomatic

45

assurances are sufficient to permit removal under FARRA. If, in fact, a particular country under consideration has an egregious record of torture, the regulations would require the Government to take such factors into account. Thus, we reject Khouzam's argument that the diplomatic assurances from Egypt are categorically insufficient under FARRA and its implementing regulations.

## B.  Fifth Amendment Due Process

Khouzam contends that we must interpret FARRA as requiring notice and a hearing prior to his removal in order to avoid serious constitutional questions that would otherwise arise. To the extent that the implementing regulations may conflict with this interpretation of FARRA, Khouzam argues, the statute must control. In the alternative, Khouzam contends that removal without notice and a hearing violates his right to due process under the Fifth Amendment. The Government counters that, *inter alia*, FARRA and its implementing regulations preclude any such process and, in any event, the Government accorded Khouzam all process he was due.

FARRA does not contain a provision for removal based on diplomatic assurances, and does not address what level of process is due to someone in Khouzam's position. Indeed, we find no provision in the relevant portion of the statute that even refers to the process to be afforded an alien. *See* FARRA § 2242. Rather, Congress left the specific issue of CAT

46

procedures to the Executive Branch by way of the authority to regulate. FARRA directed the Executive to "prescribe regulations to implement the obligation of the United States under Article 3 of [CAT]." FARRA § 2242(b). As is discussed above, the regulations adopted to implement FARRA set forth elaborate notice and hearing procedures for termination of deferral of removal in general cases. 8 C.F.R. § 1208.17(d). However, the terse portion of the regulation addressing termination on the basis of diplomatic assurances is silent with regard to what process, if any, is to be afforded the alien. *Id.* § 1208.17(f). There is nothing in the diplomatic assurance regulations themselves that we could fairly construe as providing an alien with any process whatsoever, let alone the right to a hearing. *Id.* §1208.18(c).

While the statute and regulations do not *require* a specific procedure whereby Khouzam could challenge the diplomatic assurances, through notice and an opportunity to test their reliability at a hearing, neither do they specifically *preclude* such a procedure.[12] The Government urges that affording procedures

---

[12]Section 1208.18(c) describes how the Secretary of State may secure diplomatic assurances and forward them to the Attorney General for consideration as to whether the assurances are sufficiently reliable to allow an alien's removal. But this provision does not establish any procedures for the Attorney General, or the Attorney General's delegate, to use in making

(continued...)

47

to test diplomatic assurances would conflict with 8 C.F.R. § 1208.18(c)(3). That regulation provides: "Once [diplomatic] assurances are provided . . . the alien's claim for protection under [CAT] shall not be considered further by an [IJ], the [BIA], or an asylum officer." However, we do not agree with the Government that this regulation conflicts with affording Khouzam procedures to test the diplomatic assurances.

By its terms, section 1208.18(c)(3) precludes an IJ, the BIA, or an asylum officer from "*further*" considering "the *alien's* claim for protection under [CAT]" once diplomatic assurances are proffered by the Government. *Id.* (emphasis added). We read this language only as requiring that any proceedings then underway must cease when the Government offers diplomatic assurances before an alien's substantive CAT claim has been resolved. Here, Khouzam's claim for protection under CAT was resolved by the Second Circuit before the Government proffered diplomatic assurances. The regulation does not refer to proceedings to test diplomatic assurances because such proceedings would not involve the "*alien's* claim

_____

[12](...continued)
this decision. Section 1208.17(f) is entitled, "Termination [of deferral or removal] pursuant to § 1208.18(c)," and provides that the Attorney General "may determine whether deferral should be terminated based on diplomatic assurances." 8 C.F.R. 1208.17(f). This provision likewise establishes no procedures for the actual termination itself.

48

for protection." Such proceedings would instead involve the *Government's* claim that diplomatic assurances are sufficiently reliable to justify removal, notwithstanding any likelihood of torture previously proven by the alien. Here, Khouzam seeks to challenge the use of a removal tool by the Government. Accordingly, neither the Government's assertion of diplomatic assurances, nor Khouzam's challenge to those assurances, fall within the purview of section 1208.18(c)(3).[13]

Finding no statutory or regulatory provision that either affords or prohibits procedures to challenge diplomatic assurances, we next consider whether Khouzam was entitled to process. The Government, citing *Shaughnessy v. United States*

------

[13]In considering the habeas-stripping provision of 8 U.S.C. § 1252(a)(4) above, we found that Khouzam's habeas petition fell within the statutory scope of "any cause or claim under [CAT]." *See* Note 9 *supra.* While we recognize that the term "claim" is used in both 8 U.S.C. § 1252(a)(4) and 8 C.F.R. § 1208.18(c)(3), our interpretations of the two provisions are compatible. Section 1252(a)(4) applies broadly to "any cause or claim under CAT," while section 1208.18(c)(3) applies more narrowly to an "*aliens's* claim for protection under [CAT]." (emphasis added). We see no conflict in finding that proceedings to challenge diplomatic assurances fall within the broad category of "any cause or claim" under CAT, but do not fall within the narrower scope of further consideration of the "alien's claim for protection under [CAT]."

49

*ex rel. Mezei*, 345 U.S. 206 (1953), and *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950), argues that Khouzam is entitled to no process because he was intercepted prior to entry. *Mezei* established the "entry fiction" whereby an alien intercepted "on the threshold of initial entry," though physically present in the United States, stands on a "different footing" for due process purposes than an alien who has "passed through our gates." *Mezei*, 345 U.S. at 212. *Knauff* upheld regulations affording the Attorney General special powers to exclude aliens only during war or the existence of a specific national emergency proclaimed in May of 1941. *Knauff*, 338 U.S. at 544-45.

Neither case is applicable here. One dispositive difference is that Khouzam, unlike the aliens in *Mezei* and *Knauff*, has already been granted statutory relief from removal. Moreover, we have repeatedly held that aliens detained immediately upon arrival without proper documentation are entitled to due process of law during deportation proceedings implicating statutory relief from removal. *Dia v. Ashcroft*, 353 F.3d 228, 238-39, 246-47 (3d Cir. 2003) (en banc); *Abdulrahman v. Ashcroft*, 330 F.3d 587, 596 (3d Cir. 2003); *Ezeagwuna v. Ashcroft*, 325 F.3d 396, 405 (3d Cir. 2003); *Abdulai v. Ashcroft*, 239 F.3d 543, 549 (3d Cir. 2001).

In fact, the basic dictates of due process must be met whether an alien facing removal overstayed a visa, *Borges v. Gonzales*, 402 F.3d 398, 401, 408 (3d Cir. 2005), *Fadiga v.*

50

*Att'y Gen.*, 488 F.3d 142, 145, 155 & n.19 (3d Cir. 2007) , *Jarbough v. Att'y Gen.*, 483 F.3d 184, 186, 192 (3d. Cir. 2007); entered the country undetected, *Mudric v. Att'y Gen.*, 469 F.3d 94, 96, 100 (3d Cir. 2006); *Cham*, 445 F.3d at 689, 691; *Sewak v. INS*, 900 F.2d 667, 667, 671-72 (3d Cir. 1990); or became a legal resident but then committed an enumerated crime, *Romanishyn v. Att'y Gen.*, 455 F.3d 175, 178, 185 (3d Cir. 2006); *Singh v. Gonzales*, 432 F.3d 533, 536, 541 (3d Cir. 2006); *Chong. v. Dist. Dir., INS*, 264 F.3d 378, 381, 386 (3d Cir. 2001). Further, we have recognized this right to due process not only where, as here, mandatory statutory relief from removal was at issue, *see, e.g.*, *Singh*, 432 F.3d at 536 (withholding of removal under INA § 241(b)(3) and protection under CAT); *Chong*, 264 F.3d at 381 (withholding of removal under INA § 241(b)(3)), but also where the alien was seeking discretionary statutory relief, *Abdulrahman*, 330 F.3d at 591, 596 (asylum); *Abdulai*, 239 F.3d at 545, 549 (same).

On this basis, it is a simple matter for us to conclude that Khouzam was entitled to due process before he could be removed on the basis of the termination of his deferral of removal. Next, we determine whether the Government met this constitutional obligation.

In *Mathews v. Eldridge*, 424 U.S. 319 (1976), the Supreme Court explained that "[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Id.* at 333. We have found

51

that due process guarantees three basic things in the removal context. First, an alien facing removal "is entitled to factfinding based on a record produced before the decisionmaker and disclosed to him or her." *Abdulai*, 239 F.3d at 549 (internal quotation marks omitted). This includes a "reasonable opportunity to present evidence on [his or her] behalf." *Abdulrahman*, 330 F.3d at 596. Second, the alien "must be allowed to make arguments on his or her own behalf." *Abdulai*, 239 F.3d at 549. Third, the alien "has the right to an individualized determination of his or her interests." *Id.* (brackets and internal quotation marks omitted). These elements are predicated upon the existence of a "neutral and impartial" decisionmaker. *See Abdulrahman*, 330 F.3d at 596 (internal quotation marks omitted).

It is obvious that Khouzam was not afforded notice and a full and fair hearing prior to his imminent removal on the basis of diplomatic assurances. In fact, Khouzam was afforded no notice and no hearing whatsoever. First, the Government failed to make any factfinding based on a record that was disclosed to Khouzam. The Government did not permit Khouzam to see the written diplomatic assurances that had been obtained from Egypt, and provided no information pertaining to the Government's reasons for crediting those assurances. The Government merely provided Khouzam with a cursory three-line letter dated three months after the termination decision had been made. Khouzam had no opportunity to develop a record with his own evidence. In fact, beyond the Government's bare

52

assertions, we find no record supporting the reliability of the diplomatic assurances that purportedly justified the termination of his deferral of removal.

Second, Khouzam had no opportunity to make arguments on his own behalf. The Government argues that Khouzam, after receiving notice of the termination, could have sent the DHS a letter explaining why he thought the decision was wrong. We refuse to regard the general ability of an alien to correspond with an agency as sufficient to satisfy due process, particularly after the agency has decided the pertinent issue. In addition to whatever other flaws may exist in this purported opportunity to argue, we note that Khouzam would not have had the benefit of a neutral and impartial decisionmaker.

Finally, we also find that Khouzam was denied his right to an individualized determination. Even if we assume, in the absence of a meaningful record, that the Government considered all aspects of Khouzam's case prior to terminating his deferral, we again see no indication that Khouzam had the benefit of a neutral and impartial decisionmaker. Khouzam argues that the termination decision was tainted by the bias of an organization that had been attempting unsuccessfully to remove him for nearly a decade. While "the combination of investigative and adjudicative functions does not, without more, constitute a due process violation," we are not precluded in a particular case from finding "that the risk of unfairness is intolerably high." *Withrow v. Larkin*, 421 U.S. 35, 58 (1975). On the basis of

53

these considerations, we conclude that the Government terminated Khouzam's deferral of removal without constitutionally sufficient process.

After establishing a due process violation, an alien facing removal must normally also demonstrate "substantial prejudice." *E.g. Singh*, 432 F.3d at 533 (no substantial prejudice where alien was denied ability to call additional witnesses and claimed not to have understood questions at hearing); *Romanishyn*, 455 F.3d at 185 (no substantial prejudice where alien was denied ability to call additional witnesses at hearing). Yet this case presents a special problem. The Government did not conduct a hearing or provide any meaningful record justification for the termination decision. Khouzam accordingly has no record upon which to base an argument, and we have no record upon which we may assess prejudice. Such a complete lack of process is inherently prejudicial. *Cf. Podio v. INS*, 153 F.3d 506, 509-11 (7th Cir. 1998) (reversing a BIA ruling on due process grounds where alien "was not allowed to complete his testimony or to present corroborating witnesses" (citing *Gentry v. Duckworth*, 65 F.3d 555, 559 (7th Cir. 1995) ("[P]rejudice to the right of access to the courts occurs whenever . . . court doors [are] actually shut on a complaint, regardless of whether the suit would ultimately have succeeded.)). In view of the complete absence of any process by which Khouzam could have challenged the Government's termination decision, we find it obvious that Khouzam was substantially prejudiced.

We do not attribute the lack of due process to either FARRA or its implementing regulations, for neither expressly directed the Executive to act in a manner that offends the Fifth Amendment. A statute is not facially unconstitutional unless "no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). It is also possible for a particular provision to more narrowly offend the Constitution on an "as applied" basis, and thus "'be declared invalid to the extent that it reaches too far, but otherwise [be] left intact.'" *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006) (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985)). However, neither circumstance exists here. The process of arriving at diplomatic assurances as outlined in the regulations is not problematic. *See* 8 C.F.R. § 1208.18(c). It is the ability to test those assurances prior to removal, an issue not covered in the regulations, that gives us pause from the standpoint of due process. Both FARRA and its implementing regulations are silent as to the process to be afforded to an alien subject to removal on the basis of diplomatic assurances. Therefore, neither can be said to offend the Constitution facially, nor can any particular provision be identified that "reaches too far" under Khouzam's circumstances.[14] Instead, the Executive, without relying on any

---

[14]FARRA § 2242(d) provides that "[n]otwithstanding any other provision of law, and except as provided [in the implementing regulations themselves] no court shall have

(continued...)

55

statutory or regulatory provision, reached too far by failing to provide Khouzam constitutionally adequate process.

Because the Government violated the Due Process Clause by terminating Khouzam's deferral of removal without affording him an opportunity to test the reliability of Egypt's diplomatic assurances, the termination order was invalid. Since Khouzam was taken into custody on the basis of this invalid order, he must be restored to the pre-existing terms of release granted by the District Court of the District of New Jersey on February 6, 2006.

We will remand the matter to the BIA in order to ensure that Khouzam is afforded due process before he may be removed on the basis of diplomatic assurances. While it is not our role to define the procedures to be used, we follow the example of the Supreme Court and outline the basic requirements of due process in this context. *Cf. Goldberg v. Kelly*, 397 U.S. 254, 265-72 (1970) (providing guidelines to be followed to ensure that a state affords statutory beneficiaries adequate process in the welfare termination context). Prior to removal on the basis of diplomatic assurances, Khouzam must

---

[14](...continued)
jurisdiction to review the regulations adopted to implement" the CAT provisions of FARRA. Since we find no reason to question the validity of the regulations, section 2242 neither applies nor is itself drawn into constitutional scrutiny. *See Auguste*, 395 F.3d at 138 n.13.

be afforded notice and an opportunity to test the reliability of those assurances in a hearing that comports with *Abdulai* and its progeny. The alien must have an opportunity to present, before a neutral and impartial decisionmaker, evidence and arguments challenging the reliability of diplomatic assurances proffered by the Government, and the Government's compliance with the relevant regulations.[15] The alien must also be afforded an individualized determination of the matter based on a record disclosed to the alien.[16] We have recognized the adequacy of process generally afforded aliens facing removal in other contexts, and have no doubt that the Government can readily adapt such processes to removal based on diplomatic assurances.

---

[15]Since Khouzam will have an opportunity to challenge the Government's compliance with the diplomatic assurance regulations in the hearing, we need not consider the compliance arguments he raises in his petition for review.

[16]To the extent that the Government is concerned that public disclosure of certain information may jeopardize national security, we note that existing regulations provide a procedure through which the Government can move for the issuance of an appropriate protective order. *See* 8 C.F.R. § 1003.46.

## CONCLUSION

For the foregoing reasons, we hold that the District Court had no jurisdiction over Khouzam's petition for a writ of habeas corpus, and the order granting that petition will accordingly be VACATED. We will REMAND the matter to the District Court for proceedings consistent with this Opinion. However, we also hold that we have jurisdiction over Khouzam's petition for review, and that Khouzam was denied due process. We will accordingly GRANT Khouzam's petition for review, VACATE the termination of Khouzam's deferral of removal and REMAND the matter to the BIA for additional proceedings consistent with this Opinion.

_____