**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-2927
_____

E.O.H.C.; M.S.H.S., a minor child,

Appellants

v.

SECRETARY UNITED STATES DEPARTMENT OF
HOMELAND SECURITY; COMMISSIONER
UNITED STATES CUSTOMS & BORDER PROTECTION;
DIRECTOR UNITED STATES IMMIGRATION &
CUSTOMS ENFORCEMENT; FIELD OFFICE DIRECTOR
PHILADELPHIA UNITED STATES IMMIGRATION &
CUSTOMS ENFORCEMENT
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 5:19-cv-03204)
District Judge: Honorable Joshua D. Wolson
_____

Argued: November 12, 2019

Before: AMBRO, KRAUSE, and BIBAS, *Circuit Judges*

(Filed: February 13, 2020)
_____

Anthony Vale
Michael S. DePrince            [ARGUED]
Pepper Hamilton
3000 Two Logan Square
Philadelphia, PA 19103

Tobias Barrington Wolff        [ARGUED]
3501 Sansom Street
Philadelphia, PA 19104

Bridget Cambria
Cambria & Kline
532 Walnut Street
Reading, PA 19601

Amy Maldonado
Law Office of Amy Maldonado
333 Albert Avenue, Suite 610
East Lansing, MI 48823

    *Counsel for Appellants*


Joseph H. Hunt
William C. Peachey
Erez Reuveni
Archith Ramkumar             [ARGUED]
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 868, Ben Franklin Station
Washington, DC 20044

William M. McSwain
Veronica J. Finkelstein
Anthony St. Joseph

Paul J. Koob
Office of the United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106

*Counsel for Appellees*

—————————

OPINION OF THE COURT

—————————

BIBAS, *Circuit Judge*.

This case raises the age-old question: "If not now, when?" *Mishnah*, *Pirkei Avot* 1:14. For aliens who are challenging their removal from the United States, the answer is usually "later." But not always. And not here.

Federal district courts rarely have jurisdiction to hear disputes relating to removal. That is because the Immigration and Nationality Act (INA) strips them of jurisdiction over all claims "arising from any action taken or proceeding brought to remove" aliens. 8 U.S.C. §1252(b)(9). Instead, an alien must typically litigate his removal-related claims before an immigration judge. Then, after an order of removal, he may appeal to the Board of Immigration Appeals. Only after that may he file a petition for review with a court of appeals. Usually, district courts are not part of this process.

But some immigration-related claims cannot wait. When a detained alien seeks relief that a court of appeals cannot mean-

3

ingfully provide on petition for review of a final order of removal, §1252(b)(9) does not bar consideration by a district court. Neither does §1252(a)(4), a provision that generally requires Convention Against Torture claims to await a petition for review. For if these provisions did bar review of all claims before the agency issues a final order of removal, certain administrative actions would effectively be beyond judicial review. If "later" is not an option, review is available now.

Appellants E.O.H.C. and M.S.H.S., his seven-year-old daughter, came from Guatemala through Mexico to the United States. The Government seeks to return them to Mexico while it decides whether to grant them asylum or instead remove them to Guatemala. They brought several claims in the District Court, challenging the Government's authority to return them to Mexico. The District Court dismissed all their claims for lack of subject-matter jurisdiction. We see things differently.

One claim, involving the statutory right to counsel, arises from the proceedings to remove them to Guatemala, so it can await a petition for review. But the rest of the claims challenge the Government's plan to return them to Mexico in the meantime. For these claims, review is now or never. So we will affirm in part and reverse and remand in part.

## I. BACKGROUND

### A. Facts

E.O.H.C. and M.S.H.S. are from Mixco, Guatemala, a city plagued by violent crime. Fleeing that violence, they traveled north through Mexico. In April 2019, they crossed into the United States and turned themselves in to U.S. Customs and

4

Border Patrol officers. The Government began proceedings to remove them to Guatemala, setting a June hearing date in San Diego.

Ordinarily, aliens detained pending removal proceedings would be housed in the United States. But in December 2018, the Department of Homeland Security announced a new policy called the Migrant Protection Protocols. Under those Protocols, the Government now takes many aliens who cross the United States-Mexico border and returns them to Mexico while they await their immigration hearings. *See Migrant Protection Protocols*, U.S. Dep't Homeland Security (Jan. 24, 2019), https://www.dhs.gov/news/2019/01/24/migrant-protection-protocols; *see also* 8 U.S.C. § 1225(b)(2)(C) (authorizing the Government to "return" certain aliens who "arriv[e] on land … from a foreign territory contiguous to the United States" to that neighboring country pending removal proceedings). The Protocols thus apply to aliens who have no ties to Mexico.

Under the Protocols, the Government returned E.O.H.C. and his daughter to Mexico to await their hearing. They were left to fend for themselves in Tijuana, a dangerous and violent city. Fortunately, a local family took them in.

When he and his daughter came to San Diego for their hearing, E.O.H.C. told the immigration judge that he did not fear going back to Guatemala. He later alleged that a Customs and Border Protection officer advised him to say this. He was not represented by counsel at the time and says that he did not understand that this was bad advice. The immigration judge denied asylum and ordered appellants removed to Guatemala. E.O.H.C. waived the right to appeal, allegedly because he

5

feared that the Government would return them to Mexico if they pursued an appeal. After the hearing, they were transferred to an immigration detention facility in Berks County, Pennsylvania, to await removal.

### B. Procedural history

While appellants were detained in Berks County, they appealed to the Board of Immigration Appeals. Before the Board, they argued that E.O.H.C.'s appeal waiver was invalid because he had made it under duress. The Board granted them an emergency stay of removal pending appeal. But the stay order did not make clear whether it prevented their return to Mexico or only their removal to Guatemala. And the Government flew them back to San Diego, apparently to return them to Mexico.

So appellants filed an emergency mandamus petition in the U.S. District Court for the Eastern District of Pennsylvania. The Government then brought them back to Berks County for the time being, where they remain detained today. If the Government prevails in this case, it still plans to return them to Mexico.

In their mandamus petition and preliminary-injunction motion, appellants alleged that returning them to Mexico pending their appeal to the Board would violate the law in four ways. First, they argued that the Government lacks statutory authority to apply the Protocols to them. The Protocols, they asserted, are invalid because they were adopted in violation of the Administrative Procedure Act. And even if the Protocols were valid, they added, the statutory authorization for that policy

6

does not extend to aliens entering the United States in their circumstances.

Second, they argued that returning them to Mexico would interfere with their relationship with their lawyer. This interference, they claimed, would violate their constitutional and statutory rights to counsel. *See* U.S. Const. amend. V (Due Process Clause); 8 U.S.C. § 1362.

Third, they argued that returning them to Mexico would violate the United States's treaty obligations. In particular, the Convention Against Torture forbids "return[ing] (*refouler*) or extradit[ing] a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 3, ¶ 1, Dec. 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85, 114. And the Refugee Convention prohibits "expel[ling] or return[ing] ('*refouler*') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." Convention Relating to the Status of Refugees art. 33, ¶ 1, July 28, 1951, 189 U.N.T.S. 150, 176. The duty not to remove aliens to a place where they will face persecution is known as the "non-refoulement" obligation. *See, e.g.*, *INS v. Cardoza-Fonseca*, 480 U.S. 421, 440 (1987).

Fourth, they argued that returning M.S.H.S., a minor, to Mexico would violate the United States's commitments under the 1997 *Flores* Settlement Agreement. *See* Stipulated Settlement Agreement, *Flores v. Reno*, No. CV-85-4544-RJK(Px)

7

(C.D. Cal. Jan. 17, 1997) (*Flores* Settlement Agreement). That Agreement sets forth the "nationwide policy for the detention, release, and treatment of minors" in immigration custody. *Id.* ¶9. By its terms, "[a]ny minor who disagrees" with the Government's treatment of her may sue the Government to enforce her rights under the Agreement. *Id.* ¶24(B). The Agreement remains in effect today, under the continued oversight of a district judge in the Central District of California. *Flores v. Barr*, 934 F.3d 910, 912 (9th Cir. 2019); *see Flores v. Barr*, 407 F. Supp. 3d 909, 914 (C.D. Cal. 2019) (holding that August 2019 regulations have not ended the Agreement), *appeal docketed*, No. 19-56326 (9th Cir. Nov. 15, 2019).

After a hearing, the District Court dismissed appellants' four claims, holding that it lacked subject-matter jurisdiction over all of them. 396 F. Supp. 3d 477, 480 (E.D. Pa. 2019). It observed that their statutory challenges to the Protocols and their right-to-counsel claims arise from their removal proceedings. *Id.* at 486–88. So, it reasoned, they must await a final order of removal and only then bring these claims in the court of appeals. *Id.*; *see* 8 U.S.C. §1252(b)(9) (limiting jurisdiction over legal questions "arising from any action taken or proceeding brought to remove an alien"). It also held that 8 U.S.C. §1252(a)(4) stripped it of jurisdiction over the nonrefoulement claim. 396 F. Supp. 3d at 488–89. And it held that it lacked federal-question jurisdiction over the *Flores* claim because the *Flores* Settlement Agreement is not a federal law, and it could not enforce another court's injunction. *Id.* at 485.

8

On appeal, we address only these jurisdictional questions, not the merits. Whether or not the District Court had jurisdiction, we have jurisdiction under 28 U.S.C. § 1291 to review its decision. We review de novo the District Court's dismissal for lack of subject-matter jurisdiction. *Free Speech Coal., Inc. v. Att'y Gen. of the U.S.*, 677 F.3d 519, 530 (3d Cir. 2012).

## II. THIS CASE IS NOT MOOT AND WE CAN RESOLVE IT NOW

To start off, we address two recent developments related to this case. Before we address the District Court's jurisdictional holdings, we must first satisfy ourselves that these developments have not mooted this appeal. *See, e.g.*, *Whiting v. Krassner*, 391 F.3d 540, 544 (3d Cir. 2004). We hold that they have not and that we can resolve it now.

First, after we heard oral argument, the Board issued an opinion questioning whether E.O.H.C.'s waiver of appellate rights was knowing and intelligent. *Matter of H-C-*, slip op. at 1 (B.I.A. Dec. 4, 2019). It remanded to the immigration judge for further proceedings on his and his daughter's asylum application. *Id.* at 1–2. That remand does not moot this case. The Government has stated that if appellants' challenge to the Protocols fails, it will return them to Mexico. Whatever the posture of their proceedings before the agency, this remains a live threat unless and until the two receive asylum or are removed to Guatemala.

Second, after oral argument, appellants filed a habeas petition in the District Court, seeking release from custody. Soon after that, an immigration judge granted M.S.H.S.'s request for

9

bond and ordered her released to the custody of her mother, who apparently lives in the United States. But as far as we know, M.S.H.S. is still at the Berks County facility.

The District Court denied appellants' motion for a preliminary injunction ordering the Government to release E.O.H.C. along with M.S.H.S. or give him a bond hearing. They then filed a notice of appeal in this Court, and we consolidated that appeal with this one. *E.O.H.C. v. Att'y Gen. U.S.*, No. 20-1163. Both appeals are now before this Court.

That newly consolidated appeal does not affect this one. The legal issues in the two appeals are different. The first one challenges the Government's decision to return appellants to Mexico pending a decision on their asylum application. The legal issues turn on the scope of several jurisdiction-stripping provisions in the INA and on the *Flores* Settlement Agreement. The second appeal, by contrast, challenges appellants' continued detention in Berks County. It has nothing to do with Mexico or the Protocols. The legal issues there involve substantive and procedural due process and the First Amendment. Because the challenges and salient legal issues do not overlap, we need not decide the second appeal at the same time as this one. Though we consolidated the two appeals, we have decided to resolve them separately.

Plus, even if both appellants were to be released from Berks County on bond, the Government could still return them to Mexico under the Protocols. True, the Government suggests that the Protocols *might* not continue to apply to E.O.H.C. and that habeas relief *could* hamper the Government's ability to return appellants to Mexico. And the Government does assert

10

that after her release on bond, the Protocols cannot apply to M.S.H.S. But in neither case does it offer a reason why the Protocols would no longer apply. So while the Government claims that habeas relief would moot all questions about the Protocols, it falls far short of satisfying the "heavy burden" it bears. *See Seneca Res. Corp. v. Township of Highland*, 863 F.3d 245, 254 (3d Cir. 2017).

Having assured ourselves that the controversy between the parties is still live and that the issues in this appeal are distinct from those in the second one, we will now address the District Court's grounds for dismissing appellants' challenges to their return to Mexico.

## III. THE SCOPE OF 8 U.S.C. § 1252(b)(9)

The INA limits judicial review in several ways. First, it bars challenging removal orders in district court. Instead, aliens must bring those challenges in a "petition for review filed with an appropriate court of appeals." 8 U.S.C. § 1252(a)(5). District courts lack jurisdiction over those challenges to removal. *See id.*

District courts also lack jurisdiction to review most claims that even relate to removal. To prevent piecemeal litigation, the INA usually requires aliens to bring their claims together. In particular, § 1252(b)(9) provides that if a legal claim "aris[es] from any action taken or proceeding brought to remove an alien," then "[j]udicial review of all questions of law and fact … shall be available only in judicial review of a final order" of removal. Because judicial review of a final order of removal is

11

available only in the court of appeals, district courts cannot review these "arising from" claims either.

This appeal is about appellants' interim return to Mexico, not their permanent removal to Guatemala. The District Court held that under §1252(b)(9), it lacked jurisdiction over several of the claims. So most of the jurisdictional questions depend on §1252(b)(9)'s scope: What exactly counts as an "action taken or proceeding brought to remove an alien"? And when does a "question[ ] of law [or] fact … aris[e] from" that "action … or proceeding"?

For §1252(b)(9) to apply, we must (1) identify the "action taken or proceeding brought to remove" appellants and (2) satisfy ourselves that their challenges "aris[e] from" that action or proceeding. 8 U.S.C. §1252(b)(9). The touchstones of our analysis are two presumptions, both of which support reviewability. One is the usual "strong presumption in favor of judicial review of administrative action." *INS v. St. Cyr*, 533 U.S. 289, 298 (2001). The other is "the general rule that 'the narrower construction of a jurisdiction-stripping provision is favored.'" *Alli v. Decker*, 650 F.3d 1007, 1013 n.9 (3d Cir. 2011) (quoting *ANA Int'l Inc. v. Way*, 393 F.3d 886, 891 (9th Cir. 2004)).

### A. Now-or-never claims do not "aris[e] from any action taken or proceeding brought to remove an alien"

We start with the statutory text. The relevant "action taken" cannot be the Government's return of appellants to Mexico. While the claims here "aris[e] from" that action, the action was

12

not taken to "remove" them from the United States. "Removal" is a term of art in immigration law that means sending an alien back permanently to his country of origin. *See Zhong v. U.S. Dep't of Justice*, 480 F.3d 104, 108 n.3 (2d Cir. 2007). Interim return to Mexico is not part of the process of removal to Guatemala. If anything, it makes removal more difficult, because the Government must first bring appellants back to the United States to continue their removal proceedings.

On the other hand, the Supreme Court has left open whether detention pending an asylum ruling counts as an "action[ ] taken … to remove an alien from the United States." *See Jennings v. Rodriguez*, 138 S. Ct. 830, 840 & n.2 (2018) (plurality opinion). In any event, the removal proceedings are "proceedings brought to remove" appellants from the United States to Guatemala.

But then we must confront the start of the phrase: whether the issues here are "arising from" that action or those proceedings. We hold that they are not. Though the phrase looks quite broad, we are not writing on a blank slate. In recent years, we and other circuits have wrestled with the scope of the phrase "arising from." But the Supreme Court has had the most recent word. In each of its last two Terms, it has addressed when § 1252(b)(9) strips jurisdiction over challenges to immigration detention. A majority of the Court has not settled on a precise reading of that provision. Yet the Justices appear to agree that now-or-never claims like the ones here do not "aris[e] from" detention or removal proceedings and so may go forward.

13

In *Jennings*, each Justice appeared to agree that §1252(b)(9) does not bar challenges to *conditions* of confinement, unlike challenges to removal or perhaps the *fact* of confinement. *Jennings* dealt with a class of detained aliens who claimed that the INA gave them the right to periodic bail hearings. 138 S. Ct. at 839. That challenge was not brought in a petition for review alongside a challenge to a final order of removal, so the Court had to address whether the provision stripped jurisdiction over the claim. *See id.* at 838.

A three-Justice plurality reasoned that §1252(b)(9) does not bar every removal-related claim. The plurality rejected a broad reading of the phrase "arising from" that would "make claims of prolonged detention effectively unreviewable." *Jennings*, 138 S. Ct. at 840. The plurality recognized that the phrase "arising from," read literally, could encompass all claims that would not exist but for the Government's decision to remove an alien. *Id.* This sort of "uncritical literalism," the plurality noted, could lead to "extreme" and "staggering results" that "no sensible person could have intended." *Id.* (internal quotation marks omitted). So but-for causation is not enough. Because the aliens were not challenging a removal order, the process of deciding removability, or the Government's decision to detain them or seek removal, the provision did not strip jurisdiction. *Id.* at 841.

Concurring in part and in the judgment, Justice Thomas (joined by Justice Gorsuch) took a broader view of §1252(b)(9). He reasoned that it "must at least cover congressionally authorized portions of the deportation process that necessarily serve the purpose of ensuring an alien's removal."

14

*Jennings*, 138 S. Ct. at 854. So it must limit "challenge[s] to the *fact* of [an alien's] detention" to the petition-for-review process. *Id.* at 855 (emphasis in original). But even he acknowledged that challenges to conditions of confinement may well fall outside § 1252(b)(9)'s scope. *Id.*

Justice Breyer, writing for the three dissenters, read § 1252(b)(9) more narrowly. He argued that this provision does not apply when a detainee does not challenge an order of removal itself. *Id.* at 876. Because the *Jennings* detainees were "challeng[ing] their detention without bail, not an order of removal," jurisdiction was left "unaffected." *Id.*

The Justices largely reprised these positions in *Nielsen v. Preap*, 139 S. Ct. 954 (2019). Like *Jennings*, *Preap* was brought by a class of aliens challenging whether the INA authorized their detention. *Id.* at 960–61. A three-Justice plurality repeated the *Jennings* plurality's view that § 1252(b)(9) does not bar challenges to detention rather than removal. *Id.* at 962. And the same two concurring Justices from *Jennings* restated their broader view of the provision. *Id.* at 974 (Thomas, J., concurring in part and concurring in the judgment).

We distill a simple principle from *Jennings*, *Preap*, and the presumptions favoring judicial review. That principle informs how we read the phrase "arising under." We must ask: If not now, when? If the answer would otherwise be never, then § 1252(b)(9) poses no jurisdictional bar. In other words, it does not strip jurisdiction when aliens seek relief that courts cannot meaningfully provide alongside review of a final order of removal. As the First Circuit has noted, the point of the provision is to channel claims into a single petition for review, not to bar

15

claims that do not fit within that process. *See Aguilar v. U.S. ICE*, 510 F.3d 1, 11 (1st Cir. 2007).

That is why the Supreme Court has called § 1252(b)(9) the "'zipper' clause." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999). The provision is designed to channel claims together for judicial review. *Id.* That is also why the provision is captioned "*Consolidation* of Questions for Judicial Review." 8 U.S.C. § 1252(b)(9) (emphasis added). It does not reach "claims that are independent of, or wholly collateral to, the removal process," like "claims that cannot effectively be handled through the available administrative process." *Aguilar*, 510 F.3d at 11; *accord J.E.F.M. v. Lynch*, 837 F.3d 1026, 1032 (9th Cir. 2016) (collecting cases); Reply Br. 16 (interpreting *Chehazeh v. Att'y Gen. of the U.S.*, 666 F.3d 118 (3d Cir. 2012)); Oral Arg. Tr. 20–21.

Some hypotheticals drive the point home. Consider a detained alien who needs halal or kosher food, or a diabetic who alleges that the Government is depriving him of insulin. Or take *Jennings*'s example of a challenge to prolonged detention. *See* 138 S. Ct. at 840 (plurality opinion). Under the Government's reading, these aliens could get no judicial review until the Board enters their final orders of removal. That cannot be so. For one, the final order of removal may never come. Even if it does, review and relief may come too late to redress these conditions of confinement. *Id.*; *see McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 484 (1991) (holding that the INA did not strip jurisdiction over certain claims because otherwise "meaningful judicial review … would be foreclosed").

The now-or-never principle governs here too. Although appellants must await a final order of removal to challenge their removal to Guatemala, §1252(b)(9) does not bar their challenges to their temporary return to Mexico. So as we will discuss, most of their claims may proceed.

To be clear, we do not decide whether or when Congress can strip jurisdiction. *See Osorio-Martinez v. Att'y Gen. U.S.*, 893 F.3d 153, 166 (3d Cir. 2018). We are simply applying the usual presumptions favoring judicial review in reading the law that Congress has passed. Even though this dispute may flow from an "action taken or proceeding brought to remove an alien," now-or-never challenges like most of the ones here do not "aris[e] from" that action or proceeding. Following *Jennings* and *Preap*, we will not read §1252(b)(9) so broadly as to bar all review of those claims.

### B. Section 1252(b)(9) does not bar review of the Protocols claim, the nonrefoulement claim, or the *Flores* claim

Appellants claim that the Government lacks statutory authority to apply the Protocols to them and return them to Mexico. Under our reading of §1252(b)(9), the District Court had jurisdiction over that claim. Like the one in *Jennings*, this claim does not challenge the Government's "decision to detain them in the first place or to seek removal" or "even … any part of the process by which their removability will be determined." 138 S. Ct. at 841 (plurality opinion). They allege that Tijuana is dangerous, so returning them poses a grave danger. By the time there is a final order of removal to Guatemala (if that ever

17

happens), it will be too late to review or remedy their return to Mexico in the meantime.

The same logic explains why § 1252(b)(9) does not bar the nonrefoulement claim or the *Flores* claim. Both claims allege injuries that would be caused by appellants' interim return to Mexico, not their final removal to Guatemala. Neither claim can be redressed at the end of the removal proceedings. So neither is barred by that provision. And if we were to hold that § 1252(b)(9) bars district courts from considering conditions-of-confinement claims under *Flores*, we would be gutting the *Flores* Settlement Agreement. The INA does not require that, so we will not do so.

The Government asks us to reach the merits of the Protocols claim and hold that they are indeed authorized by statute. We leave that question to the District Court in the first instance. On remand, it should consider whether the Protocols may be applied to arriving aliens who are deemed inadmissible because they lack valid entry documents, whether appellants fall within that class, and whether the Protocols are authorized for non-Mexicans who come to the United States through Mexico. *See* 8 U.S.C. § 1225(b)(1)(A)(i) (authorizing expedited removal of certain arriving aliens who lack valid entry documents); *id.* § 1225(b)(2)(C) (authorizing the return of certain aliens to a contiguous foreign country if they "arriv[e] on land … from" that country).

### C. Section 1252(b)(9) bars review of the statutory right-to-counsel claim but not the constitutional one

The now-or-never principle also resolves appellants' right-to-counsel claims. The District Court dismissed both claims for lack of jurisdiction under §1252(b)(9). The statutory version of this claim "aris[es] from" the removal proceedings and can await a petition for review. But the constitutional version does not "aris[e] from" the removal proceedings and cannot await later review. So the District Court had jurisdiction to hear the constitutional version but not the statutory one.

Appellants allege that returning them to Mexico would interfere with their relationship with counsel. First, they raise this claim under the Fifth Amendment's Due Process Clause. They argue that returning them to Mexico would hinder their ongoing access to and communication with their counsel. We do not reach the merits of that claim. *See Ponce-Leiva v. Ashcroft*, 331 F.3d 369, 374–75 (3d Cir. 2003) (noting that the scope of the constitutional right to counsel in immigration proceedings is unsettled). It is enough to note that the constitutional violation, as alleged, arises not from the efforts to remove them to Guatemala, but from those to return them to Mexico in the meantime. And the constitutional harm from those matters could not be remedied after a final order of removal. Because this too is a now-or-never claim, §1252(b)(9) does not bar a district court's review. The District Court erred in holding otherwise.

Second, they also allege that returning them to Mexico would violate their statutory right to counsel. But the INA's right-to-counsel provision grants the right only "[i]n any re-

moval proceedings before an immigration judge and in any appeal proceedings before the Attorney General from any such removal proceedings." 8 U.S.C. § 1362. The right is limited to the "proceeding[s] brought to remove" them to Guatemala, so appellants' claim "aris[es] from" those proceedings. *Id.* § 1252(b)(9). And this is not a now-or-never claim. It has nothing to do with conditions of confinement or temporary return. The statutory right is tied to the removal proceedings themselves, so there is no irreparable harm. The court of appeals can redress any deprivation of counsel in the removal proceedings before the alien is removed. Thus, the District Court rightly dismissed this claim.

## IV. THE DISTRICT COURT HAD JURISDICTION OVER THE NONREFOULEMENT CLAIM

Appellants also argue that returning them to Mexico would violate the United States's nonrefoulement obligations. The District Court found that appellants had raised a nonrefoulement claim under the Convention Against Torture but not under the Refugee Convention. We disagree. Appellants have in fact preserved the nonrefoulement claim under both treaties. But because the District Court addressed only the Convention Against Torture version of the claim, we will not say anything about the Refugee Convention here. Instead, we will leave that question for the District Court on remand.

The District Court held that it lacked jurisdiction over the Convention Against Torture nonrefoulement claim under 8 U.S.C. § 1252(a)(4). The Government agrees but argues that a different provision of the INA bars jurisdiction too: § 1252(a)(2)(B)(ii).

20

Our review of these arguments is colored by the presumptions of reviewability discussed above. So the Government faces an uphill battle. When the Government argues that a statutory scheme "prohibit[s] all judicial review" of agency decisionmaking, it bears a "heavy burden." *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015) (quoting *Dunlop v. Bachowski*, 421 U.S. 560, 567 (1975)). We look to whether "the congressional intent to preclude judicial review is 'fairly discernible in the statutory scheme.'" *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 351 (1984) (quoting *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 157 (1970)). In discerning that intent, we look at the statute's "text, structure, and purpose." *Elgin v. U.S. Dep't of Treasury*, 567 U.S. 1, 10 (2012).

Here, the Government fails to overcome the presumptions of reviewability and satisfy its heavy burden. Sections 1252(a)(4) and (a)(2)(B)(ii) do not bar review of appellants' nonrefoulement claim. We will thus reverse the District Court's dismissal.

### A. Section 1252(a)(4) does not bar review of Convention Against Torture challenges to the temporary return to Mexico

The District Court read § 1252(a)(4) to bar appellants' nonrefoulement claim under the Convention Against Torture. That provision reads:

> Notwithstanding any other provision of law (statutory or nonstatutory), including [28 U.S.C. § 2241 (habeas corpus)] or any other habeas corpus provision, and [28 U.S.C. § 1361 (mandamus against federal officers) and 28 U.S.C. § 1651 (All Writs Act)], a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of any cause or claim under the United Nations Convention Against Torture ….

At first glance, this provision appears to support the Government's position. But a closer reading of its text, informed by the statute's structure, history, and context, shows that § 1252(a)(4) was designed to bar aliens from using habeas corpus to bring duplicative Convention Against Torture claims. In other words, the provision by its terms *limits*, but does not *eliminate*, these claims. It does not bar claims, like the one here, that cannot be meaningfully brought in a petition for review. Read in that context, this provision does not overcome the strong presumptions in favor of review.

1. *The text of § 1252(a)(4) does not eliminate but limits review of all Convention Against Torture claims to petitions for review*. The Government and District Court are right that the text seems clear. The phrase "sole and exclusive means for judicial review" is strong, and its qualifications are few. And "any cause or claim under the … Convention Against Torture" is broad—especially the word "any," which we usually read broadly. *E.g.*, *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 218–19 (2008). Finally, the "[n]otwithstanding" clause and its

statutory cross-references confirm that, with narrow exceptions, the statute displaces the writs of mandamus and habeas corpus, as well as any other writ under the All Writs Act.

But the text of the provision says nothing about *barring* Convention Against Torture claims. It says only that there is one "sole and exclusive means" of *bringing* these claims. The text assumes that there will be one Convention claim, not zero. We explore the reason for that wrinkle next.

2. *The statutory history shows that § 1252(a)(4) was meant to bar only duplicative litigation like habeas petitions, not all forms of review*. The history of this provision sheds light on the text. In its 2001 decision in *St. Cyr*, the Supreme Court read the INA not to strip habeas jurisdiction over certain aliens' challenges to orders of removal. 533 U.S. at 304–05. Applying a presumption in favor of preserving habeas jurisdiction, it held that the INA's text lacked a statement clear enough to rebut that presumption. *Id.* at 299–300, 314. So aliens could bring both habeas petitions and petitions for review of their removal orders. *Id.* at 314.

In response, Congress passed the REAL ID Act of 2005, which added various provisions to § 1252, including subsection (a)(4). Pub. L. No. 109-13, div. B, § 106(a)(1)(B), 119 Stat. 231, 310. "In the REAL ID Act, Congress provided precisely what had been lacking in the statutory provisions at issue in *St. Cyr*—a clear statement within the legislation itself explicitly depriving the judiciary of habeas jurisdiction." *Khouzam v. Att'y Gen. of U.S.*, 549 F.3d 235, 245 (3d Cir. 2008). In particular, "section 106 [of the REAL ID Act] was crafted using *St. Cyr* as a roadmap." *Id.* The statute amended several existing

23

INA provisions by adding explicit references to habeas jurisdiction, making perfectly clear that district courts lack jurisdiction to hear certain challenges under 28 U.S.C. § 2241 "or any other habeas corpus provision." *E.g.*, REAL ID Act § 106(a)(2), 119 Stat. at 311 (amending 8 U.S.C. § 1252(b)(9)); REAL ID Act § 106(a)(3), 119 Stat. at 311 (amending 8 U.S.C. § 1252(g)). And it added § 1252(a)(4), which "explicitly depriv[es] the judiciary of habeas jurisdiction" over "any cause or claim under [the Convention Against Torture]." *Khouzam*, 549 F.3d at 245; *see* REAL ID Act § 106(a)(1)(B), 119 Stat. at 310.

There is one important difference between § 1252(a)(4) and its sister provisions of the REAL ID Act: only the latter speak of jurisdiction. Section 106(a)(2) of the REAL ID Act expressly added a jurisdictional bar elsewhere in the INA: "Except as otherwise provided in this section, no court shall have jurisdiction, by habeas corpus … or by any other provision of law (statutory or nonstatutory), to review [a final] order [of removal] …." 119 Stat. at 311. That sentence expressly bars jurisdiction. But § 1252(a)(4) does not. Rather, it merely *channels* review. In other words, Congress chose to strip jurisdiction expressly in one provision but omitted that language from a neighboring one it added to the same statute at the same time. We presume that Congress omitted that language intentionally. *See Sebelius v. Cloer*, 569 U.S. 369, 378 (2013).

As this history shows, the REAL ID Act's amendments to the INA were designed to stop aliens who are fighting orders of removal from getting two bites at the apple: a petition for

24

review in the court of appeals plus a habeas petition in the district court. *See Khouzam*, 549 F.3d at 245–46. That is why the texts of § 1252(a)(4) and its sister provisions list 28 U.S.C. § 2241 "or any other habeas corpus provision," as well as mandamus and other writs that could be abused to get second, third, or fourth bites at the apple.

But that is also why the text of § 1252(a)(4) speaks not of barring jurisdiction or claims, but of the "sole and exclusive means" of bringing claims. That language presumes that a Convention Against Torture claim, like an attack on a removal order, can be brought once and once only. It is not about *whether* there will be review, but when, where, and how.

Considering this history, the better reading of "any cause or claim" in § 1252(a)(4) is to require that all Convention Against Torture claims that *can* be raised in a petition for review be brought that way once and for all. Subsection (a)(4) does not bar now-or-never claims: claims that could not be meaningfully redressed by petition for review after a final order of removal.

3. *The statutory structure and context confirm that § 1252(a)(4) does not bar Convention Against Torture claims that would otherwise escape review.* Our reading of § 1252(a)(4) also fits better with our and the *Jennings* plurality's reading of § 1252(b)(9). It would be an odd statute that let aliens bring conditions-of-confinement or temporary-return claims immediately but singled out Convention Against Torture claims for harsher treatment. And barring these claims could violate the United States's treaty obligations under the Convention. "Absent explicit statutory language, we have been

25

extremely reluctant to find congressional abrogation of treaty rights." *Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 690 (1979); *accord Owner-Operator Indep. Drivers Ass'n v. U.S. Dep't of Transp.*, 724 F.3d 230, 234–36 (D.C. Cir. 2013) (collecting cases). So we read § 1252(a)(4), like § 1252(b)(9), not to bar now-or-never claims like the one here: that the Government's policy of temporarily returning aliens to Mexico violates the Convention.

In short, § 1252(a)(4) funnels Convention Against Torture claims into a single petition for review. But it does not expressly strip jurisdiction over Convention claims that cannot await a petition for review. Its text, in light of its structure, history, and context, does not overcome the strong presumptions favoring judicial review.

### B. Section 1252(a)(2)(B)(ii) does not bar review of appellants' nonrefoulement claims

The Government also claims that a different provision of the INA bars review of the nonrefoulement claims. With one exception not relevant here, that provision bars jurisdiction over challenges to "decision[s] or action[s] of the Attorney General or the Secretary of Homeland Security[,] the authority for which is specified … to be in the discretion of the Attorney General." 8 U.S.C. § 1252(a)(2)(B)(ii). The Government argues that the putative statutory support for the Protocols gives the Attorney General discretion to return aliens to the contiguous foreign country from which they came. *See id.* § 1225(b)(2)(C) (providing that the Attorney General "*may* return" certain aliens (emphasis added)).

26

The Government assumes that the Protocols are "authorized by statute." Appellees' Br. 44. It thus assumes that the Secretary is exercising "lawful statutory authority." *Id.* at 45. But appellants "do not seek review of the Attorney General's exercise of discretion." *Zadvydas v. Davis*, 533 U.S. 678, 688 (2001). "[R]ather, they challenge the extent of the Attorney General's authority under the … statute. And the extent of that authority is not a matter of discretion." *Id.* After all, no executive official has discretion to commit ultra vires acts. In any event, "[a]ny lingering doubt about the proper interpretation of 8 U.S.C. § 1252(a)(2)(B)(ii) would be dispelled by … the presumption favoring judicial review of administrative action." *Kucana v. Holder*, 558 U.S. 233, 251 (2010). So § 1252(a)(2)(B)(ii) does not apply.

### C. We need not decide whether there is a private right of action under the Convention Against Torture

The Government also argues that we should affirm the dismissal of the Convention Against Torture nonrefoulement claim on the merits. It suggests that appellants have not preserved the claim, since they initially described it as arising under the Administrative Procedure Act. And it asserts that in any case, there is no private right of action under international agreements. But the District Court ruled only that § 1252(a)(4) barred jurisdiction over any claims under the Convention Against Torture. This jurisdictional bar is the only question that we address. We leave the merits of that and other claims to the District Court. On remand, the District Court should address the merits of this claim as well as appellants' Refugee Convention claim.

27

## V. THE DISTRICT COURT HAD JURISDICTION OVER THE *FLORES* CLAIM TOO

Finally, we turn from the INA to a more general issue of federal subject-matter jurisdiction. Appellants argue that returning M.S.H.S. to Mexico would violate her rights under the *Flores* Settlement Agreement. The District Court dismissed this claim for lack of jurisdiction, holding that federal district courts other than the Central District of California may not hear claims under that Agreement. We disagree.

Paragraph 24(B) of the *Flores* Settlement Agreement purports to let minors enforce their rights under the agreement "in any United States District Court with jurisdiction and venue over the matter." That is not enough. As the District Court and Government rightly note, the parties' consent cannot create subject-matter jurisdiction where it would not otherwise exist. *Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).

But we hold that subject-matter jurisdiction *does* otherwise exist because federal common law governs. So we will reverse the District Court's dismissal of this claim too.

### A. District courts have jurisdiction over cases in which the United States or a federal agency is a party to a contract

Under settled law, there is federal-question jurisdiction over the *Flores* claim. The Agreement is a contract. The United States, through the Attorney General, is a party to that contract. *See, e.g.*, *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55

(1978) ("[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent …."). Appellants seek to enforce the United States' obligations under that contract. So their claim is governed by federal common law. And because federal common law is federal law, disputes governed by it "aris[e] under the … laws … of the United States." 28 U.S.C. § 1331. So there is subject-matter jurisdiction.

1. *The* Flores *Settlement Agreement works as a contract here*. Consent decrees are hybrids, with attributes of both contracts and injunctions. *See United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 236 & n.10 (1975); *Holland v. N.J. Dep't of Corr.*, 246 F.3d 267, 277 (3d Cir. 2001). A party can enforce its rights under a consent decree by asking the supervising court to hold the violator in contempt. When it does, a consent decree works as an injunction. But when a party seeks not to punish but to enforce the other party's commitments under the agreement, the consent decree works more like a contract. *See ITT Cont'l,* 420 U.S. at 236 ("[C]onsent decrees and orders have many of the attributes of ordinary contracts.").

Here, it works like a contract. M.S.H.S. is not asking the Court to hold the Department of Homeland Security or the Attorney General in contempt for violating her rights under the *Flores* Settlement Agreement. Instead, she seeks only to vindicate what she claims are her contractual rights under that settlement. In other words, she claims that the Government is violating its contractual duties. As the District Judge overseeing the *Flores* Settlement Agreement in the Central District of California has repeatedly recognized, the settlement is a "binding

contract." *See, e.g.*, *Flores*, 407 F. Supp. 3d at 931. So this suit is like any other suit alleging that the United States has breached its contractual obligations. As we explain next, these suits are governed by federal common law.

2. *The United States is a party to this contract, so federal common law governs*. This contract is not between private parties. It includes the United States, because the Attorney General, the Department of Justice, and the predecessor to the Department of Homeland Security entered into it. And when the United States is a party to a contract, federal common law governs that contract. *See Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988); *Clearfield Tr. Co. v. United States*, 318 U.S. 363, 366–67 (1943).

True, "[t]here is no federal *general* common law." *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) (emphasis added). But federal common law does govern those pockets of law "marked by pressing interests of the United States." *Wallach v. Eaton Corp.*, 837 F.3d 356, 365 n.11 (3d Cir. 2016). Those pockets include cases "concerned with the rights and obligations of the United States." *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981). The terms of a consent decree agreed to by the United States are such obligations. Thus, disputes about the meaning of consent decrees to which the United States or a federal agency is a party are governed by federal common law.

3. *The* Flores *claim, governed by federal common law, supports federal-question jurisdiction*. "[C]laims founded upon federal common law" arise under the laws of the United States and support federal-question jurisdiction. *Illinois v. City of Milwaukee*, 406 U.S. 91, 100 (1972). This is because rules

30

fashioned by federal courts exercising their common-law-making authority "are as fully 'laws' of the United States as if they had been enacted by Congress." *Id.* (quoting *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 393 (1959) (Brennan, J., dissenting in part and concurring in part)). In other words, "there is no longer any question that the word 'laws' within the meaning of §1331[] embraces claims founded upon federal common law." *Ne. Dep't ILGWU Health & Welfare Fund v. Teamsters Local Union No. 229 Welfare Fund*, 764 F.2d 147, 154 (3d Cir. 1985). Because the United States is a party to the *Flores* Settlement Agreement through its officers and agencies, contractual claims to enforce that settlement arise under federal common law. Thus, there is federal-question jurisdiction here.

We note that this rule applies only to consent decrees to which the United States is a party (either directly or through a federal agency). We have no occasion to consider whether federal common law governs federal consent decrees between private parties. *See Evoqua Water Techs., LLC v. M.W. Watermark, LLC*, 940 F.3d 222, 236–37 (6th Cir. 2019) (Bush, J., concurring).

4. *The Government's counterarguments fail*. In response, the Government argues that a breach-of-consent-decree claim "do[es] not belong in federal court, 'unless there is some independent basis for federal jurisdiction.'" Appellees' Br. 18 (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 382 (1994)). With that much we agree. Even though there was federal jurisdiction over the *original* dispute that led to the *Flores* Settlement Agreement, that fact alone does not entail continuing federal jurisdiction to enforce the Agreement. In

31

*Kokkonen*, for instance, a federal district court had subject-matter jurisdiction over the original dispute that led to the settlement. *See* 511 U.S. at 376. Yet it lacked jurisdiction to enforce that settlement agreement later. *See id.* at 380. So far, so good.

But the calculus changes when the United States is a party to the agreement. When the United States (or its agent) is a party, the contract claim arises under federal common law. The Government disagrees, but the cases it cites are distinguishable. Several involved only private parties. *See Kokkonen*, 511 U.S. at 376–77; *Shaffer v. GTE N., Inc.*, 284 F.3d 500, 501 (3d Cir. 2002); *Bowen v. Monus* (*In re Phar-Mor, Inc. Sec. Litig.*), 172 F.3d 270, 272–73 (3d Cir. 1999). And the ones in which the United States was a party involved *damages* claims against the United States. In these cases, the problem was that the Tucker Act's limited waiver of sovereign immunity bars bringing such claims (whether or not they stem from settlement agreements) except in the Court of Federal Claims. *See Munoz v. Mabus*, 630 F.3d 856, 863–64 & n.5 (9th Cir. 2010); *Shaffer v. Veneman*, 325 F.3d 370, 372–73 (D.C. Cir. 2003); *see also* 28 U.S.C. §1491(a)(1). And the Eleventh Circuit's brief, unpublished per curiam opinion relied heavily on the settlement agreement's specific reservation of jurisdiction in a different court. *Slaughter v. U.S. Dep't of Agric.*, 555 F. App'x 927, 929 (11th Cir. 2014) (per curiam). Even if we found that analysis persuasive, the *Flores* Settlement Agreement contains no such exclusive reservation of jurisdiction when it comes to an individual minor's claims. *See Flores* Settlement Agreement ¶24(B).

Nor are we persuaded by the Government's argument from the text of paragraph 24(B) of the *Flores* Settlement Agreement. The Government argues that the word "jurisdiction" in the Agreement would be superfluous if there were already subject-matter jurisdiction in the district courts as a whole. But as the Government itself argues elsewhere, the word "jurisdiction" in the parties' agreement cannot *create* subject-matter jurisdiction on its own. By the same logic, we cannot see how jurisdiction can somehow be *divested* simply to avoid creating surplusage in the language of this particular contract. When deciding jurisdiction, we look not to the language of the contract but to the usual principles of Article III and § 1331. Those principles support jurisdiction here.

## B. Questions about the proper district court go to venue, not jurisdiction

As a rule, subject-matter jurisdiction does not vary from district court to district court. Take the general federal-question jurisdiction statute, 28 U.S.C. § 1331. It vests original jurisdiction over cases arising under the Constitution, federal law, or treaties in "[t]he district courts." *Id.*; *see also id.* § 1332(a) (vesting diversity jurisdiction in "[t]he district courts"); *id.* § 1333 (vesting admiralty, maritime, and wartime-prize jurisdiction in the "[t]he district courts"). To be sure, jurisdiction over certain *classes* of cases is vested in particular courts. For instance, jurisdiction over contractual damages claims against the United States is vested exclusively in the Court of Federal Claims. *See id.* § 1491(a)(1); *see also, e.g.*, 35 U.S.C. § 293 (vesting exclusive jurisdiction over foreign patentees in the Eastern District of Virginia). But such cases are the exception,

not the rule. In general, the district courts as a whole either all have or all lack subject-matter jurisdiction.

The District Court thought that rule did not govern this case. It correctly recognized that each court "has the inherent power to enforce its own orders," but generally lacks the power to enforce orders of other courts. 396 F. Supp. 3d at 485; *see, e.g.*, *Alderwoods Grp., Inc. v. Garcia*, 682 F.3d 958, 970 (11th Cir. 2012). But as we explained, that is not what M.S.H.S. is trying to do here. Instead, she is trying to vindicate her *contractual* rights under the *Flores* Settlement Agreement. And though the District Court worried about forum shopping, the Government took that risk when it agreed to the consent decree. The Agreement itself contemplates that its enforcement will extend to "any United States District Court with jurisdiction and venue over the matter." *Flores* Settlement Agreement ¶24(B).

To be sure, it may well be the norm that the responsibility to enforce a consent decree lies solely with the district judge who entered it. *See Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 523 n.13 (1986) (describing consolidated enforcement as one of the advantages of consent decrees). And cases of in rem jurisdiction may involve other jurisdictional limitations. *See, e.g.*, *Alderwoods*, 682 F.3d at 969. But we see no *general* jurisdictional bar to another district court's taking part in enforcing a consent decree when one party sues to enforce its terms.

Finally, we note that the District Court raised its ground for dismissing M.S.H.S.'s *Flores* claim sua sponte and that it de-

clined appellants' offer of supplemental briefing. Our adversarial system relies on giving each side a full and fair opportunity to air its best arguments and authorities. Rarely should a court address a complex issue without the benefit of briefing.

\* \* \* \* \*

Immigration claims ordinarily proceed from an immigration judge through the Board of Immigration Appeals to the court of appeals by petition for review of a final removal order. Review by district courts is not the norm. But neither is this case. Most of the claims here cannot await a petition for review. By the time appellants are ordered removed to Guatemala (if ever), it will be too late to review their claims about their return to Mexico in the meantime. Only their statutory right-to-counsel claim will still be redressable. So the INA does not bar review of the remaining claims. And there is federal-question jurisdiction over the *Flores* claim. Because the United States is a party to the *Flores* Settlement Agreement, the contract claim is governed by federal common law and so arises under federal law. In short, the District Court has jurisdiction over most of the claims. We will thus affirm the dismissal of the statutory right-to-counsel claim and otherwise reverse and remand for the District Court to address the merits.